[Cite as *In re S.A.*, 2019-Ohio-4782.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE S.A., III,

A Minor Child

:

:

:

No. 107707

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED

**RELEASED AND JOURNALIZED:** November 21, 2019

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL18107149

---

### *Appearances:*

Timothy Young, Ohio State Public Defender, and Timothy Hackett, Assistant State Public Defender, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Nora Caitlin Bryan, Assistant Prosecuting Attorney, *for appellee.*

---

MICHELLE J. SHEEHAN, J.:

**{¶ 1}** The Cuyahoga County Court of Common Pleas Juvenile Court found that appellant S.A. III ("S.A.") committed acts that, if committed by an adult, would constitute the offenses of robbery, in violation of R.C. 2911.02(A)(2) and 2911.02(A)(3), and possessing criminal tools, in violation of R.C. 2923.24(A). S.A.

appeals the court's denial of his motion to suppress and the court's adjudication of delinquency. Upon a thorough review of the record, we find (1) the juvenile court did not error in failing to determine S.A.'s motion to suppress before proceeding to a trial on the merits; (2) trial counsel was not ineffective in agreeing to defer the suppression hearing; (3) the victim's identification at the cold-stand identification procedure was reliable; and (4) the juvenile's court's finding of delinquency was supported by the evidence. We therefore affirm the juvenile court's denial of the motion to suppress and the court's adjudication of delinquency.

I. Procedural History and Substantive Facts

{¶ 2} On June 6, 2018, S.A. was charged in juvenile court as follows: Count 1 — robbery in violation of R.C. 2911.02(A)(2); Count 2 —robbery in violation of R.C. 2911.02(A)(3); Count 3 — possessing criminal tools in violation of R.C. 2923.24(A); and Count 4 — failure to disclose personal information. At the time the complaint was filed, S.A. was 15 years old.

{¶ 3} The complaint stems from an incident that occurred at approximately 10:00 p.m. on June 5, 2018, involving the victim, Barbara Blue, who reported to the Lakewood police department that she had been robbed in a neighbor's driveway. After receiving Ms. Blue's 911 call, an officer was dispatched to the victim's location. Shortly thereafter, officers in the vicinity indicated that they had a suspect in custody matching the description given by the victim. The officers, after driving Ms. Blue to the suspect's location, conducted a "cold-stand" or show-up identification, where Ms. Blue positively identified S.A. as the individual who had robbed her.

{¶ 4} On August 7, 2018, S.A. filed a timely motion to suppress the victim's out-of-court identification. In support, S.A. argued that the "cold-stand" procedure of identification utilized by the Lakewood police officers was so impermissibly suggestive as to cause an unreliable identification, and the identification must therefore be suppressed. The state opposed the motion to suppress. The record demonstrates that sometime before the start of trial, the parties agreed to the court's decision to defer its consideration of the motion to suppress until testimony had been presented by the witnesses at trial. Thereafter, on August 16, 2018, a bench trial proceeded.

{¶ 5} At the conclusion of the proceedings, the trial court heard from the parties on the alleged delinquent's motion to suppress. Thereafter, the court made findings concerning the cold-stand procedure and the victim's identification and it denied the motion to suppress. Defense counsel then moved for a Crim.R. 29 dismissal, which the trial court denied as to Counts 1 through 3 but granted as to Count 4. Following closing arguments, the trial court found all of the elements of Counts 1 through 3 had been established. The court further found that the evidence established beyond a reasonable doubt that S.A. was the individual who committed the offenses. The court then adjudicated S.A. delinquent of Counts 1 through 3. Proceeding directly to disposition, the court committed S.A. to the department of youth services for a minimum period of 12 months and a maximum period not to exceed S.A.'s attainment of the age of 21 years.

{¶ 6} On September 24, 2018, S.A. appealed the court's order denying his motion to suppress as well as the court's adjudication. On January 4, 2019, S.A. filed a motion to supplement the appellate record with an investigating officer's body camera video footage. According to S.A.'s appellate counsel, the video was not formally admitted into evidence at the hearing and consequently did not become part of the appellate record. Counsel stated, however, that the video was played during cross-examination and was therefore considered by the trial court. Counsel submits in his motion that this court should likewise consider the contents of the officer's body camera footage on appeal. The state did not oppose S.A.'s motion.

{¶ 7} The record indicates that just prior to trial counsel's recross-examination of the victim, counsel requested to play the video, stating, "Your Honor, I'd like at this point just to play a brief video clip. It's gonna be just a couple of minutes. I want to just play the whole thing. It's some body cam footage. And I'll ask a question." At that point, counsel asked the victim to clarify her identification. The state did not object to the playing of the body camera video footage during the proceedings.

{¶ 8} This court granted S.A.'s motion to supplement the record but deferred to the panel the issue whether the video footage would be considered in resolving the appeal. Because the video was played in open court during recross-examination, without objection, we presume the trial court considered the video prior to reaching its decision on the motion to suppress and its adjudication. We therefore consider the officer's body camera video footage on appeal.

## A. Evidence at Trial

{¶ 9} The state presented the testimony of the victim, Barbara Blue, and Lakewood police officers, Ryan Summerville and Frederick Mance. The state also submitted as evidence the audiotaped 911 call placed by the victim.

{¶ 10} Ms. Blue testified that she had been at a nursing care facility caring for her elderly father on the evening of June 5, 2018. She left the nursing facility at approximately 9:30 p.m., arriving near her home in Lakewood at approximately 10:00 p.m. She parked her car on Roycroft Avenue, looked at the back end of the car and then the front end, to evaluate her parking. She then noticed a bicycle on the sidewalk, thinking perhaps it belonged to a neighbor. Carrying her purse and two grocery bags, she proceeded to walk to her home when "a young man passed on [her] left very quickly and very close." She stated that the young man startled her, she exclaimed "ooh," and then she apologized to the individual. Ms. Blue stated that the young man did not say anything to her and he proceeded north on Roycroft Avenue. She observed him "moving on," and she turned to walk up the driveway to proceed home.

{¶ 11} Ms. Blue testified that she was halfway up the driveway when she noticed someone standing to the left side of her. She testified that she turned to face him and he said, "I'm going to hurt you, give me your purse." The individual was thin, a "very light build, not really filled out with muscle," young, and "about 5 foot 6, 5 foot 7," and wearing blue jeans and a gray top. He had his hand under his shirt, pointing. Assuming he was pointing with his hand, Ms. Blue decided that she did

not want to give the young man her purse and she told him to go away. Rather than leaving, the individual grabbed the victim's purse, turned, and ran down the driveway. Ms. Blue ran after him, yelling for him to stop. When she noticed the bicycle was gone, she realized that "it was futile" to try and chase him. She then called 911 with her cell phone. In her 911 call, Ms. Blue reported that the suspect was a "black guy" on a bike, a teenager, thin, "about as tall as [she is]," which she stated was 5 foot 10". Ms. Blue also reported that the alleged robber was traveling north on Larchmont Avenue.

{¶ 12} When the police officer arrived, Ms. Blue reported what had happened. She testified that the officer indicated that he "think[s]" the police "have the person who did this," and the officer asked her to get into the back seat of his patrol car and he would take her to identify the suspect. Upon arriving at the suspect's location, the officers brought the suspect out of a patrol car. Ms. Blue testified that while she could not "perfectly pick out his face because there was a reflection * * * from the streetlight," she identified him by his "total physique," his clothing — blue jeans and a gray top, his hair style, his "slimness," "his skin color, being somewhat dark," and "the way he carried himself." The victim also identified the bicycle the suspect was riding. Ms. Blue identified S.A. in the courtroom as the young man who robbed her on the evening of June 5, 2018.

{¶ 13} Officer Summerville testified that he was on patrol on the evening of June 5, 2018, when he responded to a call from dispatch at approximately 10:04 p.m. for a report of a robbery on Roycroft Avenue, adjacent to Larchmont

Avenue. Officer Summerville testified that he proceeded to the victim's location and took the victim's statement. He received from the victim a description of the suspect as a slender black male in a gray shirt and jeans riding a bike. Approximately four to five minutes after receiving the call from dispatch, Officer Summerville received a call from another officer that a suspect had been located one block away from the victim. At this point, Officer Summerville drove the victim to that location to identify the suspect, arriving at approximately 10:20 p.m. The officer testified that he used his vehicle's spotlight to light the area to conduct a cold-stand identification. Officer Summerville testified that the victim positively identified S.A. as the individual who robbed her that evening. The officer stated that the victim specifically identified the suspect's blue jeans and gray sweatshirt with the same height and build and noted that he was on a bike.

{¶ 14} Officer Mance testified that he was on patrol the evening of June 5, 2018, when he heard on the police radio at 10:04 p.m. that a woman had been robbed on Roycroft Avenue and the suspect was a young black male wearing blue jeans and a gray jacket and was riding a bicycle. The officer arrived at the last known location of the suspect within minutes of hearing the report. He then drove one street east of the reported location and located a suspect matching the description. Officer Mance estimated the distance between the scene of the crime and the location of the suspect to be approximately one-half mile. The officer testified that he had the suspect in custody at approximately 10:08 p.m. He stated that another officer brought the victim to the scene where she made a positive identification of

the suspect as the individual who robbed her. Officer Mance identified S.A. in the courtroom as the individual who was identified by the victim at the scene and the individual he arrested.

B. Body Camera Video

{¶ 15} When Officer Summerville arrived at the victim's location, his body camera began recording. The victim explained to the officer what happened, and the officer told Ms. Blue that "I believe we have him in custody already." He then asked the victim, "Would you be able to positively identify him if you saw him?" Ms. Blue responded, "Yes. I heard his voice, too." Officer Summerville then advised the victim, "All I need is if you can positively identify him." The officer then placed the victim in his patrol car and explained to her, "I'm going to drive you up to where they're at. Okay, like I said, the windows are tinted, and it's dark, so he won't be able to see you, okay? All's I need from you is to positively identify him, and I will bring you right back, okay?" Officer Summerville then drove Ms. Blue to the suspect's location.

{¶ 16} Upon arriving at the suspect's location, the following exchange occurred:

Officer: He's going to be right over here, okay, over by these officers. * * * He's going to have him step out now, okay? Is that him?
Victim: That's the build. I can't see his face.
Officer: Hold on one second. [And the officer moved his patrol car presumably closer to the suspect.] Is that better?
Victim: No. I cannot see his face to know. His clothes — [The officer's radio interrupted with another officer explaining that the suspect was being uncooperative.]
Officer: I'm sorry. What did you say, Ma'am?

Victim: The clothes. It's his clothes, but I just can't see the face perfectly.

{¶ 17} At this point, the officer asked the other officers to "have [the suspect] step a little closer." The victim explained that she still could not see the features of his face, but "it's everything else." The officers attempted once again to move the suspect closer. The victim stated "I still don't know if I could see him" and then repeated that it is "exactly the clothes." The officer asked, "That's exactly the clothes he was wearing?" and the victim replied, "Mhm [and] exactly his build." The victim then recalled that the young man who robbed her had a bicycle, "a trick bike" on the ground. Officer Summerville radioed the officers regarding the bike, advising the officers that the victim "saw that also," and those officers rolled a bike into the victim's view. The victim identified the bike as the one the alleged robber was riding. Officer Summerville then advised the other officers that the victim had positively identified the suspect.

## II. Assignments of Error[1]

I.   The juvenile court erred as a matter of law and violated S.A.'s right to a fair trial when it failed to determine S.A.'s suppression motion prior to trial.

II.  S.A. was denied his constitutional right to the effective assistance of counsel when defense counsel unreasonably acquiesced in the juvenile court's decision to defer the suppression hearing and ruling until after the contested evidence had already been introduced at trial.

---

[1] In the interest of judicial economy, we will address the first and third assignments of error together.

III. The juvenile court erred as a matter of law and violated S.A.'s constitutional rights when it denied his motion to suppress, even though the cold-stand procedure was unduly suggestive and the resulting identification was vague, uncertain, and unreliable.

IV. The juvenile court's finding of delinquency was against the sufficiency and manifest weight of the evidence.

## III. Motion to Suppress

{¶ 18} In his first assignment of error, S.A. objects to the manner in which the trial court heard the motion to suppress, arguing that the court erred in not determining the motion to suppress before trial. S.A. also contends, in his third assignment of error, that the trial court erred in denying his motion to suppress. In support, S.A. argues that the "cold-stand" procedure of identification utilized by the Lakewood police officers was so impermissibly suggestive as to cause an unreliable identification, and the identification must therefore be suppressed.

## A. Standard of Review

{¶ 19} Appellate review of a motion to suppress presents a mixed question of law and fact; we accept the trial court's findings of fact if they are supported by competent, credible evidence, but we must independently determine whether the facts satisfy the applicable legal standard. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "[W]hen there is substantial evidence to support the factual findings of the trial court, the decision on the motion to suppress will not be disturbed on appeal absent an error of law." *State v. Bates*, 8th Dist.

Cuyahoga No. 92323, 2009-Ohio-5819, ¶ 36, citing *State v. DePew*, 38 Ohio St.3d 275, 528 N.E.2d 542 (1988).

## B. The Suppression Hearing

{¶ 20} Crim.R. 12(C)(3) provides that a motion to suppress evidence must be filed prior to trial. And Crim.R. 12(F) states that a motion to suppress "shall be determined before trial." Noting that the plain language of Crim.R. 12[F] does not vest the trial court with any discretion as to when motions to suppress are to be determined, this court previously determined that the trial court's

> "failure to conduct a hearing on the motions to suppress prior to the trial, coupled with the subsequent disallowal of any independent hearing upon such motions, effectively denied the defendant the right to refute any of the testimony presented by the prosecution upon the issues surrounding the arrest, the search, and probable cause, and thus prevented the defendant from challenging the constitutional validity of the evidence used to establish his guilt."

*State v. Litten*, 174 Ohio App.3d 743, 2008-Ohio-313, 884 N.E.2d 654, ¶ 30 (8th Dist.), quoting *State v. Young*, 8 Ohio App.2d 51, 53-54, 220 N.E.2d 704 (2d Dist.1996).

{¶ 21} The analogous juvenile rule provides that a motion to suppress "must be heard before the adjudicatory hearing." Juv.R. 22(D)(3). This rule, however, does not require a hearing on a separate date. *Id.* Additionally, providing some discretion in the trial courts, Juv.R. 22(E) titled "Motion Time" states that "the court in the interest of justice may extend the time for making prehearing motions," and "for good cause shown," the trial court "may permit a motion to suppress evidence under division (D)(3) of this rule to be made at the time the evidence is offered."

{¶ 22} In a factually similar case, the Tenth District Court of Appeals considered a defendant's contention that the court violated Juv.R. 22 when it failed to conduct a suppression hearing prior to trial and it found that the magistrate had discretion to hear the defendant's motion to suppress "during the relevant portions of the proceedings." *In re Hill*, 10th Dist. Franklin No. 03AP-82, 2003-Ohio-6185, ¶ 8. The court of appeals concluded that the same or similar testimony was necessary for the motion to suppress as well as adjudication; when the magistrate considered the motion to suppress, the defendant "had a full opportunity to have any concerns about [the subject of the suppression motion] addressed by the court"; and the magistrate ruled on the motion to suppress prior to adjudication. *Id.* The court therefore found that "any error arising from the failure to hold a motion hearing prior to the adjudicatory hearing" did not prejudice the defendant. *Id.*

{¶ 23} Here, the state's three witnesses for the motion to suppress — the victim, Officer Summerville, and Officer Mance — were the same witnesses for the trial. And the case was heard to the bench. Therefore, the trial judge was the trier of fact for both the suppression issues and the adjudication. In the interest of judicial efficiency, the trial court determined, and the parties agreed, that rather than having the same witnesses testify twice, it would hear the evidence together and ultimately make a separate decision on the suppression and the trial. Indeed, the record demonstrates that after the evidence was presented, the trial court afforded the parties an opportunity to present their arguments concerning the

alleged delinquent's motion to suppress. At this time, S.A. had an opportunity to address any concerns about the identification.

{¶ 24} After the parties presented their case, the trial court carefully analyzed the facts of S.A.'s identification as they applied to the current law on cold-stand identifications. In so doing, the court made detailed findings regarding the victim's opportunity to view the suspect, the victim's degree of attention, the accuracy of the victim's description, the victim's level of certainty, and the length of time between the 911 call and the identification:

> I am required to focus on the reliability of the ID and not the process. That's what [the law] says. That's my job. And in doing that, in determining whether or not to grant a request to suppress an ID, I have to evaluate five factors * * *.
>
> Did the witness have an opportunity to view the defendant at the time of the offense? Well, according to Miss Blue's testimony, she viewed the individual twice. At least a face-to-face confrontation was when the person brushed up against her on * * * her left side. She saw him then. And then she indicated that she saw him during the exchange when the person told her that I'm going to hurt you, give me your purse. She said she was looking directly at the individual at that time.
>
> And then there was a third time for her when the person was running away. She got a chance to see again the person's body, stature, what the person was wearing, and so she had at least three opportunities to view the assailant.
>
> The witness's degree of attention. Well, she gave a description of his height, his weight, his body structure, his race, clothing, and mode of travel.
>
> There wasn't anything distracting about him in terms of she said no, he was not wearing a mask, no, he did not have on some kind of handkerchief that was covering up his face or his eyes. None of that was distracting for her.

She was able to get a clear view of what the person looked like.

The accuracy of the witness's prior description of the suspect before the suspect was restrained.

Officer Mance stated that he saw a person who fit the description that he was given over the radio[:] young, black, male, wearing a gray shirt, jeans, and riding a bicycle.

The level of certainty demonstrated by the witness when she arrived on scene indicated that he fit the description of the person who forcibly took her purse. She knew by his clothing, by his body structure and his race that that was him.

What she couldn't see was the particulars of his face due to reflection coming from the light, but she stated here in court when she was asked to ID him, that's him. That's what she said.

She said, I am sure that that's him. Officer Mance indicated that he was 75 feet away, and that's why she wasn't able to get the particulars of his face. He was 75 feet away. But the outline of his body, the fact this is a black male, the fact that he has on the same clothes as the person who accosted her, the same kind of outfit, not blue pants, but she said blue jeans. Not a gray hoodie, he had on a gray shirt.

And then the length of time between the call and the second confrontation. The offense ended sometime around 10. I know [the prosecutor] said 10:04, but the officer indicated that's when they actually ran towards the area where the assailant went, and then went back to her home before she called 9-1-1, and then waited a few minutes before they came.

So that was about — had to be somewhere after 10:00 they actually arrived. The police arrived and they talked to her until they left around, I think not Officer Mance but the other officer indicated it was about 10:20, and then they arrived at approximately 10:22 at the area where the officers had detained [S.A.]. And then she made the ID between 10:22 and 10:30.

That was within minutes of the offense. * * * [It]'s not hours, it's not days. [It's] minutes within the offense.

[In further evaluating] the circumstances in this case, [Miss Blue was] face-to-face with the assailant. [He did not have] on a mask or anything covering [his] face. * * * Miss Blue actually stated his clothing and body structure after — saw his body structure and his clothing after he fled.

[Miss Blue] chased after the assailant and knew which direction he fled in. [And he] gave a description of race, height, and clothing.

Miss Blue did say approximate height, but more particularly, she told the police 5-7. Nevertheless, she never told them that he was tall. She also gave a body type and mode of transportation. * * *

[The assailant[ was] located within a close proximity of the incident. Cold stand was conducted within minutes, * * * approximately 20 or 30 minutes in this case. * * *

[M]emory of an event will be fresh within minutes of it occurring. * * * It wasn't two [hours], it wasn't six [hours], it wasn't the next day. Memories do tend to fade when you talk about hours or days, but not 30 minutes.

{¶ 25} Ultimately, the court determined that the victim's identification was reliable and it denied the motion to suppress.

{¶ 26} Thereafter, in moving to the trial issues, counsel for the alleged delinquent moved for a Crim.R. 29 dismissal. Counsel argued that the state had not presented sufficient evidence on each of the four counts. The state conceded that it had not met its burden on Count 4, failure to disclose personal information. The court then granted the motion as to Count 4 and denied it as to the remaining counts. After having addressed the motion to dismiss, the parties presented their closing arguments, and then the court made its findings on the adjudication, which was delinquency on Counts 1 through 3.

{¶ 27} We agree that, generally, the better practice is for trial courts to hear motions to suppress before the adjudicatory hearing. We find under these circumstances, however, that the alleged delinquent was not denied a meaningful opportunity to contest the cold-stand identification, and any error arising from the failure to hold a suppression hearing prior to the adjudicatory hearing did not prejudice S.A. *In re Hill*, 10th Dist. Franklin No. 03AP-82, 2003-Ohio-6185, at ¶ 8.

{¶ 28} Although the witness testimony was presented only once, for both the suppression and the adjudication, the record demonstrates that this same testimony was necessary for the motion to suppress as well as the adjudication. And absent evidence to the contrary, we presume the trial judge, as the trier-of-fact, "performed his [or her] duty and did not rely upon anything in reaching his [or her] decision that he [or she] should not have relied upon." *Columbus v. Guthmann*, 175 Ohio St. 282, 194 N.E.2d 143 (1963), paragraph three of the syllabus; *State v. Neal*, 8th Dist. Cuyahoga No. 89574, 2008-Ohio-1077, ¶ 11 (stating that "a reviewing court will presume that the trial court acted impartially and considered only properly admitted evidence"). Moreover, after the evidence had been presented, the court permitted the parties to address the suppression issues, and thereafter, the court made explicit findings concerning the cold-stand identification procedure. It was only after the court had resolved the suppression issues that the court proceeded with the adjudication, addressing a Crim.R. 29 motion and hearing the parties' closing arguments.

{¶ 29} S.A.'s first assignment of error is overruled.

## C. "Cold-Stand" Identification

{¶ 30} A "cold-stand" or "show-up identification" is a pretrial identification procedure whereby the police have a suspect into custody and "take him to be identified by a witness." *In re T.H.*, 8th Dist. Cuyahoga No. 106433, 2018-Ohio-2300, ¶ 12. An alleged delinquent has a due process right to suppress an out-of-court identification such as a cold-stand where the procedure is "'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Id.* at ¶ 12, quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

{¶ 31} In reviewing the admissibility of a cold-stand identification, courts use a two-prong test. *State v. Davis*, 8th Dist. Cuyahoga No. 101502, 2015-Ohio-1144, ¶ 19. First, there must be a determination that the identification procedure "'was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification.'" *Neil v. Biggers*, 409 U.S. 188, 197, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), quoting *Simmons* at 384; *In re T.W.*, 2017-Ohio-8875, 100 N.E.3d 1239, ¶ 6 (8th Dist.); *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634, ¶ 38 (10th Dist.). The burden of demonstrating that the procedures used were unnecessarily suggestive is upon the defendant. *State v. Quarterman*, 8th Dist. Cuyahoga No. 99317, 2013-Ohio-4037, ¶ 26.

{¶ 32} If the defendant demonstrates that the identification procedure was impermissibly suggestive, the court must next determine whether the witness's identification was unreliable under the totality of the circumstances. *Davis* at ¶ 21;

*In re T.W.* at ¶ 7.  The factors that must be considered when evaluating reliability are (1) the witness's opportunity to view the offender; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the suspect; (4) the witness's level of certainty when identifying the suspect; and (5) the length of time between the crime and the confrontation.  *Biggers* at 199-200.

{¶ 33} Although generally a cold-stand or show-up identification is discouraged, "'an exception is recognized when the suspect is apprehended at or near the scene of the crime and is presented to the victim or witness shortly thereafter.'"  *State v. Smith*, 8th Dist. Cuyahoga No. 94545, 2011-Ohio-924, ¶ 18, quoting *State v. Davis*, 8th Dist. Cuyahoga No. 83033, 2004-Ohio-1908.  The Ohio Supreme Court explained:

> "There is no prohibition against a viewing of a suspect alone in what is called a 'one-man showup' when this occurs near the time of the alleged criminal act; such a course does not tend to bring about misidentification but rather tends under some circumstances to insure accuracy. * * *
>
> "[P]olice action in returning the suspect to the vicinity of the crime for immediate identification in circumstances such as these fosters the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh."

*State v. Madison*, 64 Ohio St.2d 322, 332, 415 N.E. 2d 272 (1980), quoting *Bates v. United States,* 132 U.S.App.D.C. 36, 405 F.2d 1104, 1106 (1968); *State v. Thomas*, 8th Dist. Cuyahoga No. 88548, 2007-Ohio-3522, ¶ 17.

{¶ 34} Moreover, this type of identification violates due process "only if the circumstances surrounding the identification are unnecessarily suggestive and unreliable after evaluating the totality of the circumstances." *Smith* at ¶ 17, citing *Manson v. Brathwaite*, 432 U.S. 98, 112-113, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The focus, therefore, is upon the reliability of the identification and not the identification procedures themselves. *Smith* at ¶ 19.

{¶ 35} S.A. contends that the trial court failed to consider whether the cold-stand identification procedure was unduly suggestive, and he argues the procedure was in fact impermissibly suggestive. The record demonstrates that the trial court did indeed "focus[] on the reliability of the ID and not the process." (Trial transcript, p. 70-71.) Rather than analyzing the method by which the police officers obtained Ms. Blue's identification of S.A. as her assailant, the court proceeded to a determination regarding the reliability of Ms. Blue's identification, under the second prong of the test for the admissibility of a cold-stand identification. In so doing, the court considered the five reliability factors outlined in *Biggers* before denying S.A.'s motion to suppress. Likewise, in its brief on appeal, the state addressed only the *Biggers* factors in urging this court to affirm the trial court's denial of the motion to suppress.

{¶ 36} "The purpose of the reliability inquiry is to determine whether the unduly suggestive nature of the identification was overcome by the reliability of the witness." *In re T.W.*, 2017-Ohio-8875, 100 N.E.3d 1239, at ¶ 16, citing *State v. Williams*, 10th Dist. Franklin Nos. 02AP-730 and 02AP-731, 2003-Ohio-5204, ¶ 44

(the officers' statements were immaterial because the witness's identification was reliable). In this case, regardless of whether the cold-stand was suggestive, we find the victim's identification was reliable and overcomes any suggestive nature of the identification process.

{¶ 37} Here, as the trial court stated, the victim had several opportunities to view the suspect. The first time Ms. Blue saw the suspect was when he approached her left side, and he was so close to the victim that he startled her. She then watched him walk away before she proceeded home. Ms. Blue next observed the suspect when he returned to her, with his hand under his shirt, stating that he was going to hurt her, and demanding her purse. Finally, Ms. Blue continued to observe the suspect as he was running away because she was chasing after him. A witness does not need "an extended period of time to view the suspect * * * for the identification to be deemed reliable. Mere seconds can be enough time." *In re T.W.* at ¶ 11, citing *State v. Walker*, 10th Dist. Franklin No. 02AP-679, 2003-Ohio-986, ¶ 17 (finding two or three seconds in which the victim observed the suspect, who was not wearing a mask and part of his hair was visible, demonstrated the reliability of the identification); *United States v. Wong*, 40 F.3d 1347, 1360 (2d Cir.1994) (finding that looking at the suspect's face for two to three seconds was sufficient for identification to be deemed reliable). Ms. Blue therefore had ample opportunity to observe the individual who robbed her.

{¶ 38} We also find, as the trial court did, that Ms. Blue was attentive during the robbery. Within minutes of the robbery, she provided a description of her

assailant's age, race, build, and clothing. In her 911 call, she stated that her assailant was a thin, black, male teenager. She reported that he was wearing blue jeans and a gray top. Although there was some discrepancy regarding the victim's testimony concerning the individual's height, ranging from 5'6" or 5'7" to 5'10", the victim's description was always an approximation. On the 911 call, she described her assailant as "*about* as tall as I am * * * 5/10", and at trial, she testified that he was "*about* 5 foot 6 or 5 foot 7." (Emphasis added.)

{¶ 39} Additionally, Ms. Blue reported to police dispatch that her assailant was on a bicycle and he was traveling north on Larchmont Avenue. Ms. Blue's accurate physical description of the assailant, along with the reported mode and direction of travel, permitted the responding officers to identify the suspect fitting Ms. Blue's description only one street east of the assailant's reported location, within minutes of the reported crime.

{¶ 40} Courts have held that a general description of an assailant's approximate age, race, gender, and attire can be reliable, especially where the assailant is discovered shortly after the crime was reported or in the vicinity of the reported location. *State v. McRae*, 8th Dist. Cuyahoga No. 96253, 2011-Ohio-6157, ¶ 14 (finding a witness's identification reliable where the suspect was apprehended near the area the witness claimed the assailant had fled, wearing clothing matching the witness's description); *State v. Thompson*, 8th Dist. Cuyahoga No. 79938, 2002-Ohio-2390, ¶ 21 (finding the witness's identification reliable where the witness provided a description of the defendant's race, height, facial hair, and

clothing, prior to the cold-stand, and the identification was conducted within minutes of the crime); *State v. Smith*, 11th Dist. Trumbull No. 2008-T-0023, 2008-Ohio-6998, ¶ 29 (finding that where a suspect is apprehended only minutes after the crime occurred wearing distinguishing clothing that the witness specifically remembers from the crime increases the reliability of the identification); *Walker,* 10th Dist. Franklin No. 02AP-679, 2003-Ohio-986, at ¶ 17 (concluding the witness's pre-identification description of the suspect's race, size, hair, hat, and clothing demonstrated reliability).

{¶ 41} The record also demonstrates that Ms. Blue was certain of her identification of S.A. as her assailant. When Officer Summerville asked Ms. Blue, upon arriving at her location, if she would be able to identify her assailant, she replied, without hesitation, "Yes." Within minutes of placing the 911 call and speaking with Officer Summerville, Ms. Blue positively identified S.A. as the individual who robbed her. Although she had difficulty seeing the suspect's facial features, the record shows that this difficulty was due to a reflection from the officer's spotlight. Nothing in the officer's body camera footage demonstrates uncertainty other than the victim's candid admission that she could not see the suspect's face in the light's reflection. During the cold-stand, however, Ms. Blue stated definitively that it was "exactly the clothes" her assailant was wearing and "exactly his build." She also reminded the officer that the individual had a bike, and when the officers rolled the bike into view, Ms. Blue identified the bike. Moreover,

Ms. Blue reiterated her identification of S.A. in the courtroom without hesitation or confusion. *Thompson* at ¶ 21.

{¶ 42} Regarding the final reliability factor, the record demonstrates that Ms. Blue arrived in Lakewood and parked her car at approximately 10:00 p.m. Officer Summerville responded to a call from dispatch concerning the robbery at approximately 10:04 p.m. While taking the victim's statement, Officer Summerville received a call from other investigating officers in the area within another four or five minutes, indicating that a suspect had been located. Officer Summerville then drove Ms. Blue to the suspect's location at approximately 10:20 p.m. Ms. Blue positively identified S.A. shortly thereafter. Therefore, the length of time that elapsed between the crime and the confrontation was no more than 30 minutes, while the robbery was still fresh on the victim's mind. *Thompson* at ¶ 21 (finding an identification made within minutes of a crime "fresh" on the witness's mind and therefore reliable).

{¶ 43} Under the totality of the circumstances noted above, we find that Ms. Blue's identification of S.A. as the individual who robbed her was reliable, and the alleged suggestive nature of the identification was overcome by the reliability of the witness. *In re T.W.*, 2017-Ohio-8875, 100 N.E.3d 1239, at ¶ 16. The trial court's denial of S.A.'s motion to suppress was therefore proper.

{¶ 44} S.A.'s third assignment of error is overruled.

IV. Ineffective Assistance of Counsel

{¶ 45} In his second assignment of error, S.A. contends that trial counsel's "acquiescence" with the court's decision to defer the suppression hearing and ruling until after the evidence had been presented at trial constituted ineffective assistance of counsel.

{¶ 46} To establish a claim of ineffective assistance of counsel, S.A. must demonstrate (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Thus, "the failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel." *State v. Davenport*, 8th Dist. Cuyahoga No. 106143, 2018-Ohio-2933, ¶ 25, citing *Strickland* at 697.

{¶ 47} In Ohio, every properly licensed attorney is presumed to be competent and, therefore, a defendant claiming ineffective assistance of counsel bears the burden of proof. *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Counsel's tactical decisions or trial strategy cannot form the basis for a claim of ineffective counsel. *State v. Foster*, 8th Dist. Cuyahoga No. 93391, 2010-Ohio-3186, ¶ 23, citing *State v. Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189 (1980).

{¶ 48} Here, S.A.'s trial counsel agreed to the trial court's decision to defer the suppression hearing and ruling until after the evidence had been presented at

trial. We presume that counsel's agreement with the court's proposal was a tactical decision that would perhaps garner favor with the judge hearing the evidence; save the court's, the parties', and the witnesses' time; and avoid duplication of the evidence. Regardless of counsel's reasons for agreeing to the court holding one hearing, however, we previously found that the manner in which the trial court proceeded did not prejudice the alleged delinquent. Moreover, we found that the trial court properly denied S.A.'s motion to suppress the victim's cold-stand identification.

{¶ 49} In light of the above, we cannot find that had defense counsel objected to the court hearing the suppression and the adjudication evidence together, the result of the trial would have been different.

{¶ 50} S.A.'s second assignment of error is overruled.

### V. Sufficiency and Manifest Weight

{¶ 51} In his final assignment of error, S.A. contends that the court's adjudication of delinquency was not supported by sufficient evidence and was against the manifest weight of the evidence. In support, S.A. essentially argues that the victim's pretrial identification was improper, the victim's in-court identification was not credible, and the record "is entirely devoid of any other evidence implicating [him]."

{¶ 52} When assessing a challenge of sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt

beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶ 53} The elements of an offense may be proven by direct evidence, circumstantial evidence, or both. *See State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674 (1991). Direct evidence exists when "a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish." *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Circumstantial evidence, on the other hand, is evidence that requires "the drawing of inferences that are reasonably permitted by the evidence." *Id.* *See also State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37 ("[c]ircumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind"). Circumstantial and direct evidence are of equal evidentiary value. *State v. Santiago*, 8th Dist. Cuyahoga No. 95333, 2011-Ohio-1691, ¶ 12.

{¶ 54} A manifest weight challenge questions whether the state has met its burden of persuasion. *Thompkins* at 390. This challenge raises a factual issue:

> "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The use of the word "manifest" in the standard of review "means that we can only reverse the trier of fact if its decision is very plainly or obviously contrary to the evidence." *State v. Hernandez*, 8th Dist. Cuyahoga No. 106577, 2018-Ohio-5031, ¶ 20. And a finding that a conviction was supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. *State v. Howard*, 8th Dist. Cuyahoga No. 97695, 2012-Ohio-3459, ¶ 14, citing *Thompkins* at 388.

{¶ 55} S.A. was adjudicated delinquent of robbery in violation of R.C. 2911.02(A)(2), which provides that "[n]o person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, attempt to inflict, or threaten to inflict physical harm on another. S.A. was also adjudicated delinquent of robbery in violation of R.C. 2911.02(A)(3), which prohibits an offender from using force or threatening "the immediate use of force" against another while attempting or committing a theft offense. Finally, S.A. was

adjudicated delinquent of possessing criminal tools in violation of R.C. 2923.24(A), namely the bicycle.

{¶ 56} Here, Ms. Blue testified that a young black male approached her on the evening of June 5, 2018, threatened to hurt her, and demanded her purse. Ms. Blue testified that she did not want to give up her purse, but the young man grabbed the purse from her hands and fled on his bicycle. She attempted to chase him but could not keep up, and she called 911. Officer Mance located a suspect matching the victim's description only one street east of the suspect's reported location within minutes of hearing the report. Less than 30 minutes later, Ms. Blue identified S.A. in a cold-stand as the young man who robbed her that evening. Although she admitted that she could not see the suspect's facial features due to the light's reflection, she was able to positively identify S.A. by his clothes and build, and she identified the bicycle S.A. was riding when he fled. We found Ms. Blue's identification reliable, based on the *Biggers* factors. Additionally, Ms. Blue identified S.A. in the courtroom as her assailant.

{¶ 57} In light of the foregoing, we find the evidence supports S.A.'s adjudication of delinquency in Counts 1 through 3. S.A.'s final assignment of error is overruled.

{¶ 58} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution. The finding of delinquency having been affirmed, any bail or stay of execution pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

EILEEN T. GALLAGHER, P.J., and
RAYMOND C. HEADEN, J., CONCUR