**[Cite as *State v. Wright*, 2021-Ohio-2133.]**

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28831 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-2281 |
| | : | |
| VINCENT WRIGHT | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 25th day of June, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

DAVID E. STENSON, Atty. Reg. No. 0042671, 131 North Ludlow Street, Suite 316, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

EPLEY, J.

{¶ 1} Defendant-Appellant Vincient Wright (spelled Vincent in the trial court, which this court retains in the caption, pursuant to App.R. 3(D)) was convicted after a jury trial in the Montgomery County Court of Common Pleas of four counts of aggravated robbery with firearm specifications. Wright was acquitted of a fifth aggravated robbery charge. Wright appeals from his convictions, claiming that (1) his trial counsel rendered ineffective assistance, (2) his convictions were against the manifest weight of the evidence, (3) the prosecutor engaged in misconduct during the questioning of a witness, and (4) cumulative error deprived him of a fair trial. For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 2} Wright was charged with five counts of aggravated robbery with firearm specifications arising from the armed robberies of Family Dollar and Dollar General stores in Dayton between April 20, 2019 and July 10, 2019. The State's evidence at trial established the following facts.

*April 20 Robbery – Family Dollar at 1125 Wayne Avenue*

{¶ 3} At approximately 5:20 p.m. on April 20, 2019, Kurt Hegemier and his son, Kiel, drove to the Family Dollar store at 1125 Wayne Avenue so that Kiel could purchase diapers for his young child. Kiel went into the store while his father waited in a van. Within a few minutes, a man walked past Kurt's van, pulled up his hoodie, reportedly put on a mask, and walked into the store. Kiel, who was waiting to check out at the counter, saw the man walk in, pull out a handgun, rack the gun, and tighten the hoodie around his face. The robber held the gun in his left hand and cinched the hoodie with his right hand.

Kiel thought the gun might have been fake, but he was not sure. The man told Kiel to get back, went around the counter, and told the cashier to hurry up and put money in a bag. After the cashier handed him a plastic bag with cash from the register, the man left the store and ran into the surrounding neighborhood.

{¶ 4} At 5:24 p.m., Dayton Police Officer Seth Victor and his partner were dispatched to the Wayne Avenue store. Officer Victor reviewed surveillance video and determined that the perpetrator had touched very little – just the door, from which it would be difficult to obtain fingerprints (the robber did not wear gloves). The officer obtained a description of the robber: male, about 5'7", wearing a black hoodie and black sweatpants. A store employee reported in her 911 call that the sweatshirt was Nike brand, and the surveillance video showed that the sweatshirt was worn inside out. Other individuals said during a second 911 call that the robber was balding and had tattoos on his neck.

{¶ 5} The Dayton Police Department's Violent Offender Unit investigates all robberies in Dayton. In the spring and summer of 2019, the unit had six detectives and two Bureau of Alcohol, Tobacco and Firearms (ATF) special agents assigned to the office. According to Detective Nathan Curley, the assigning detective, the unit uses crime pattern analysis and does independent follow-up investigations of robberies.

{¶ 6} Detective Curley assigned himself to the April 20 robbery of the Family Dollar store on Wayne Avenue. He went to the scene, spoke with witnesses, and watched the surveillance video. Curley saw in the video that the suspect ran down the road behind the Family Dollar store, then down an alley that runs perpendicular to that road. A witness reported that the man then got into a silver car and drove away. Detective Curley was unable to find video footage of the silver vehicle.

*May 31 Robbery – Dollar General at 2821 Linden Avenue*

{¶ 7} At approximately 9:30 p.m. on May 31, 2019, Kara Wellman was working as the assistant manager at the Dollar General store at 2821 Linden Avenue. As Wellman was preparing to go into the safe to make a "cash drop" and change out large bills for smaller bills, a man entered the store wearing a dark hoodie, dark pants, and dark shoes; he was not wearing gloves. The hoodie was pulled closed so only his eyes and nose were visible. The man jumped over the barrier to get behind the counter, holding his hood closed with his right hand while holding a gun in his left hand. Wellman did not see the man approach her, but she heard him say, "Yeah, open the safe." The safe was behind the counter near the registers. Wellman noticed that the man had a gun pointed at her.

{¶ 8} Wellman opened the safe and backed away. The robber crouched down by the safe, pulled out a money tray with his right hand and then took cash with that hand before transferring it to his left. He then passed the money back to his right hand and put the money in his right pocket. After the man took money from the safe, Wellman opened a register. While Wellman opened the register, the robber held his hood closed with his left hand. He then grabbed money from the register with his right hand, transferred it to his left hand, and put it in his left pocket. As the robber left the store, he held his hood closed with his left hand. Wellman called 911.

{¶ 9} Dayton Police Officer Christopher White was dispatched to 2821 Linden Avenue on a report of an armed robbery in progress at that location. The dispatch indicated that the male perpetrator was dressed in dark clothing and was last seen running through the parking lot. Instead of heading directly to that location, the officer

drove around the area, looking for the perpetrator, but he did not locate any suspects. Officer White reported that another crew conducted a traffic stop of potential suspects nearby, but it appeared that vehicle's occupants had nothing to do with the robbery.

{¶ 10} Officer White then drove to the store to assist other officers in the investigation. White reviewed security footage, and he noted that the perpetrator had entered the store and jumped over the barrier separating customers from the employees at the register. Once over the barrier, the robber brandished a handgun and ordered an employee to open the safe and cash register. The robber brushed the employee aside, took money from both, hopped back over the barrier, and left the store. Officer White estimated that the robber was 5'9" or 5'10" tall.

*June 10 Late Afternoon Robbery – Dollar General at 2312 North Main Street*

{¶ 11} During the late afternoon on June 10, 2019, Sommer Stroope was the assistant manager at the Dollar General Store at 2312 North Main Street. Tonia Smith was working as the cashier. Shortly before 5:00 p.m., a male dressed in a black hooded sweatshirt with a distinctive white logo, black pants, and black Nike shoes entered the store. The hood of the sweatshirt was cinched around the man's face. The man jumped the counter and told Smith to open the register. After the register was open, he reached in with his right hand, transferred the cash to his left hand, and then put it in his left pocket. The robber then jumped back over the counter and left. As he exited the store, his left hand was in his pocket, and he held his hood closed with his right hand.

{¶ 12} Smith called to Stroope that she had been robbed and that the robber had a gun. Stroope told Smith to call 911, and she (Stroope) went into the office to gather video footage for police officers to view. Stroope indicated that her store had been

robbed several times previously. The manager estimated that approximately $100-150 was taken during this robbery.

{¶ 13} As other police units canvassed the area, Detective Mark Orick responded to the store. Orick was familiar with the store's surveillance system. A week and a half prior to the robbery, he had been assigned to the store to operate the camera system in anticipation that the store could be robbed again. Upon responding to the Dollar General, the detective reviewed the surveillance video. Detective Orick studied the logo on the robber's sweatshirt and ascertained that the logo belonged to a company called "Self Made."

*June 10 Evening Robbery – Dollar General at 445 Salem Avenue*

{¶ 14} Later on June 10, Kendall Simmons was working at the Dollar General store at 445 Salem Avenue at the intersection of Salem and Grand Avenues. An assistant manager, a custodian, and a co-worker named Deron were also working at the store that evening. At approximately 8:30 p.m., Simmons and Deron were working at the registers while the assistant manager was in the office. At 8:33 p.m., a man in a black hoodie with a "Self Made" logo on the front, "Self Made" sweatpants, and red Nike shoes came into the store. Although his hood was up, the man's left hand was by his side, and his right hand was below his chin, making his face initially visible on the interior surveillance camera of the front door. The man cinched the hoodie with his right hand, approached Deron (who was at the register closest to the door), briefly pointed a gun at him, and told Deron to give him money. Deron opened the register and backed away. The robber climbed over the bagging area and took cash from the register. The robber was not wearing gloves.

{¶ 15} The robber then approached Simmons at his register and told him to open it. Simmons "fiddled with the drawer," trying to buy time for the police to come. After a few moments, the robber lost patience and headed back toward the door. He climbed back over the bagging area and went to the exit, holding his hoodie closed with his right hand. As the robber walked out of the store, he had both hands by his left pocket and then by his sides. The robber's face was visible on the surveillance video of the exterior of the front door. Witnesses reported to the police dispatcher that the robber ran down the alley behind the store.

{¶ 16} Officer Jeffrey Downing, an evidence technician, responded to the report of a robbery at the Dollar General store. After talking with Officer Burch, who was already at the scene, Officer Downing viewed surveillance video to see where the perpetrator may have touched. Downing then dusted around Registers 1 and 4 for fingerprints and swabbed around Register 1 for DNA.

{¶ 17} Officers Dustin Daugherty and David Eck were dispatched to 445 Salem Avenue on a report of a robbery in progress. The officers did not respond directly to the store and, instead, drove around in search of a suspect. While driving on northbound Grafton Avenue just south of West Grand Avenue, a short distance from the Dollar General store, the officers observed a hooded sweatshirt lying in the middle of the roadway. The officers called for an evidence technician.

{¶ 18} Officer Downing went from the store to Grafton Avenue, photographed the hoodie, and collected it. Downing also was notified that a pair of red Nikes were found on Federal Street approximately a block from the store. Downing went to that location and collected the shoes. He took the items to the police department's evidence garage,

where he swabbed around the collar and sleeves of the sweatshirt for DNA.

{¶ 19} Detective Justin Ellis was the primary detective on the June 10 robbery of the Dollar General store. On June 12, he and his partner, Detective Heiser, drove the sweatshirt and shoes to the Ohio Bureau of Criminal Investigation (BCI) for analysis.

*The Identification of Wright as a Suspect*

{¶ 20} Logan Schepeler, a forensic scientist in the DNA section of BCI, performed DNA testing on four swabs submitted by the Dayton Police Department. The swabs were taken from the inside collar area of the sweatshirt, a tag from the sweatshirt, and each cuff of the sweatshirt (the shoes were not tested). The swabs from the cuffs did not have enough DNA for Schepeler to make a comparison. Testing from the collar and the tag, however, revealed two major DNA contributors. Schepeler compared the contributors' DNA profiles against known DNA profiles in a database, which included Wright's DNA profile; Wright's DNA previously had been submitted to the database in August 2017. Wright was determined to be a major contributor for the DNA samples from the tag and collar submitted by the Dayton police.

{¶ 21} At approximately 9:00 a.m. on July 10, 2019, detectives received an email from BCI with the DNA results. That morning, Detectives Ellis and Curley spoke with Rodney Howell, a State of Ohio employee, who knew Wright through his employment and had met with Wright on four or five occasions for approximately an hour each. Howell told the detectives that he knew where Wright lived. Howell and the detectives met at Wright's residence on Burkhardt Avenue. Wright was not there. Howell attempted to call Wright but was unable to reach him. The detectives showed Howell a photograph taken from one of the surveillance videos from the fourth robbery (Salem Avenue Dollar

General).    Howell told the detectives that Wright was the individual in the photograph.

{¶ 22} While Howell and Dayton detectives and police officers waited at Wright's residence for Wright to return, the police received a report of another armed robbery at a Family Dollar on Main Street.   Howell and Detectives Curley and Ellis remained at the residence while other officers and detectives responded to the robbery.   Approximately ten to 20 minutes later, Howell received a phone call from Wright, who said that he (Wright) had just woken up and wanted to talk.   Wright told Howell that he was at 1302 North Main Street.   Howell relayed the address to the detectives, who then left to go there.

*July 10 Robbery – Family Dollar at 1130 North Main Street*

{¶ 23} During the morning of July 10, 2019, Paige Hayes was working as a cashier at the Family Dollar store at 1130 North Main Street at the intersection of Main and Helena Streets.   The assistant manager, Marcus, was also there.   At 10:56 a.m., while Marcus was in the back, a man wearing a black hoodie, inside-out gray sweatpants, and black shoes came into the store.    An employee told the dispatcher that the hoodie was a Nike sweatshirt. Detective Curley testified that the surveillance video showed it was a Champion hoodie.   The man pulled a black gun out of the left pocket of his hoodie, walked in front of the check-out counters, and went behind the counter to Hayes.   Hayes was at Register 2, the register farther away from the door.   The man told Hayes to unlock the register.   After Hayes responded that she could not do that, the man "cocked his weapon back and a bullet flew out" onto the floor.   Hayes opened the register, and the man took the cash.

{¶ 24} The robber then told Hayes to open Register 1.   Hayes was unable to do

so, because she did not have access.   She called to Marcus, her co-worker, who had access to register 1.   While waiting, the robber kept his right hand pulling on the strings of his hoodie so his face would not show.   Marcus approached the register, carrying a box-cutter, which he placed on the counter.   The robber pushed the box-cutter off of the counter with his gun.   After opening the register, Marcus and Hayes stepped away.   The robber took the money from the register with his right hand and put it in his pocket.   He picked up the money tray, looking for bills underneath, and dropped it, causing coins to scatter on the floor.   The robber then turned to leave, looking under the money tray of Register 2 as he walked by it.   The man fled the store with approximately $200.   Hayes called the police.

{¶ 25} Officers Jared Burson and Gary Lowe responded to the Family Dollar store. When they arrived, the parking lot was empty and the front doors to the store were locked. Upon entering the store, Officer Burson noticed that the registers were open, and one register had its tray taken out.

{¶ 26} Officer Robert Cleaver heard the dispatch and reported with his canine partner, Phantom.   Cleaver spoke with the officers at the scene and learned that the suspect had gone across the street and down an alleyway that ran parallel to Main Street. Officer Cleaver got Phantom from the cruiser, went to the alleyway, and gave Phantom the command to track.   Phantom put his nose to the ground to see if he could pick up a scent, then proceeded down the alley.   At a couple of locations, Phantom stopped and turned his head to the left, but he continued down the alley.

{¶ 27} After another block or two, Phantom indicated that he had lost the scent. They turned around and headed back down the alley.   At the same location where

Phantom had stopped before and turned his head, Phantom again stopped and turned his head in the same direction.   This time, Officer Cleaver saw a couple of detectives, including Detective Curley, standing at the house located at 1302 North Main Street.

{¶ 28} The police located Wright at 1302 Main Street, the home of Andre Carpenter and Debra Horton, approximately 500 feet from the Family Dollar store.   Carpenter and Horton allowed the police to search their home.   Officers located a black Champion hoodie consistent with the one worn by the robber.

*Additional Investigation*

{¶ 29} After Wright's arrest, Detective Ellis interviewed him.   During that interview, the detective provided Wright a *Miranda* form, which Wright signed.   Ellis noticed that Wright signed the paperwork using his left hand and held the paper still with his right hand.   At trial, Ellis identified a photograph that showed Wright as he looked when the two men met.   The photograph showed that Wright had a receding hairline and a large tattoo on his neck.

{¶ 30} On August 9, Detective Ellis again met with Wright and collected a DNA sample from him.   A few days later, Detective Ellis drove Wright's DNA sample to BCI for comparison against the DNA profiles from the sweatshirt.   Schepeler compared the new sample of Wright's DNA against the DNA profiles from the "Self Made" sweatshirt. Wright again was found to be a major contributor to the DNA samples found on the tag and collar.   Schepeler also was asked to compare Andre Carpenter's DNA against the samples from the sweatshirt.   Testing showed that Carpenter was not one of the two major contributors to the DNA on the tag and collar.

{¶ 31} Detectives took measurements in the stores to determine the height of the

robber, as shown in surveillance video. Measurements indicated that the robber at each store was 5'10" or 5'11" tall. Detective Curley testified that Wright was approximately 5'11" tall. At some point, detectives showed Howell the surveillance video from the fourth robbery. Howell identified Wright as the person in the surveillance video.

*Procedural History*

{¶ 32} On July 18, 2019, Wright was indicted on five counts of aggravated robbery, each with a firearm specification. In November 2019, he filed a motion to dismiss the charges on speedy trial grounds. The trial court overruled the motion, reasoning that the triple-count provision of R.C. 2945.71 did not apply because Wright was under post-release control and subject to a hold order from the Adult Parole Authority. Wright did not file a motion to suppress any of the evidence against him.

{¶ 33} The matter proceeded to a jury trial in June 2020. After deliberating, the jury found Wright guilty of four of the aggravated robberies and accompanying firearm specifications. It acquitted him of the May 31 robbery of the Dollar General store on Linden Avenue (Count 2). The trial court sentenced Wright on Counts 1, 3, 4, and 5 to an indefinite sentence of a minimum of four years and a maximum of six years in prison, with an additional three years for the firearm specification. The specifications in Counts 4 and 5 were run consecutively to each other. Wright's aggregate sentence was a minimum of 10 years and a maximum of 12 years in prison.

{¶ 34} Wright appeals from his convictions, raising five assignments of error. We will address them in an order that facilitates our analysis.

## II. Manifest Weight of the Evidence

{¶ 35} In his second assignment of error, Wright claims that his convictions were

against the manifest weight of the evidence.

{¶ 36} "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact. Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 37} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 38} In his appellate brief, Wright argues that the jury could not have reasonably concluded that he was the perpetrator of the offenses, and he details the differences between each of the robberies of which he was convicted. He emphasizes that

witnesses could only see a small portion of the perpetrator's face and no witness at any scene identified the robber. Witnesses provided varying heights for the perpetrator, and the robber wore different clothing and shoes in each robbery; some of the clothing was different even between the two robberies on June 10, 2019. Kendall Simmons, the employee at the Dollar General store on Salem Avenue, testified that the "Self Made" logo was "pretty common." In the first robbery (Wayne Avenue), a witness indicated that the robber was wearing glasses and a mask, and another witness identified the gun as matte gray. In other robberies, witnesses did not mention glasses, and the gun was described as black. No fingerprints or DNA evidence was located at the stores. Wright further notes that, while the State contended that the robber was left-handed, that characteristic is not uncommon. Wright thus argues that due to the discrepancies in the robberies and the lack of a nexus between the individual robberies, his convictions were against the manifest weight of the evidence.

{¶ 39} We recognize, as Wright asserts, that no eyewitness or physical evidence at the scenes connected Wright to the robberies. In addition, the jury could have reasonably concluded (as it apparently did with respect to the second robbery) that Wright did not commit all of the robberies due to discrepancies between the incidents. Nevertheless, upon review of the entire record, we cannot conclude that the jury lost its way in convicting Wright of the robberies on April 20, June 10, and July 10.

{¶ 40} The State presented substantial evidence that Wright committed the robbery of the Dollar General store at 445 Salem Avenue, the fourth robbery. The perpetrator of that robbery entered the store wearing a "Self Made" black hoodie, "Self Made" sweatpants, and red Nike shoes. Although the man cinched the hood of the

sweatshirt to hide a portion of his face during the robbery, his face was visible on surveillance video as he both entered and exited the store. Upon being shown a photograph taken from the surveillance video, Rodney Howell identified the individual in the photograph as Wright. Howell also identified Wright at trial, and when shown the surveillance video of the fourth robbery at trial, Howell testified that he recognized Wright "from the beginning when he walked in." Shortly after the robbery, officers located a "Self Made" sweatshirt lying in the middle of the roadway with a few blocks of the Dollar General store on Salem. DNA testing from the collar area of the sweatshirt revealed that Wright was one of two major contributors to the DNA. Given the evidence at trial, Wright's conviction for the robbery of the Dollar General store at 445 Salem Avenue was not against the manifest weight of the evidence.

**{¶ 41}** Although no one identified Wright as the perpetrator of the fifth robbery (the robbery of the Family Dollar store at 1130 North Main Street), circumstantial evidence supported the jury's conclusion that Wright also committed this robbery. The robber wore a hooded sweatshirt and sweatpants similar in style to those worn during the fourth robbery, and consistent with the robbery on Salem Avenue, the robber of the Family Dollar store held his hoodie closed with his right hand while holding a gun in his left hand. After obtaining cash from both registers, the man left on foot and went into the nearby neighborhood. A canine officer tracked the perpetrator for a distance along an alley that ran parallel to North Main Street. Wright was discovered shortly after the robbery at a home located approximately 500 feet from the Family Dollar store, close to where the dog tracked. Officers found a black Champion hooded sweatshirt, consistent with the one worn by the robber, inside the home where Wright was located. Based on the evidence

presented at trial, we cannot conclude that the jury lost its way when it convicted Wright of the 1130 North Main Street Family Dollar store robbery.

{¶ 42}   There was less evidence linking Wright to the April 20 robbery of the Family Dollar store on Wayne Avenue and the June 20 robbery of the Dollar General store at 2310 North Main Street.   Nevertheless, there was circumstantial evidence supporting his participation in those robberies.   The police received a detailed description of the perpetrator of the Wayne Avenue robbery, including his height, his clothing, and that he was balding and had a tattoo on his neck.   Wright matched the description of the robber.

{¶ 43} The State also presented evidence that the robberies between April 10 and July 10 exhibited numerous commonalities, such that the jury could reasonably conclude that the same individual committed all of the offenses.   In each of the robberies, the perpetrator wore a hooded sweatshirt, which the man kept cinched using his right hand. During the two robberies on June 10, the robber wore the same "Self Made" hooded sweatshirt.   In each robbery, the man drew a gun with his left hand from his sweatpants pocket.   In two of the robberies – the first and the fourth – the robber racked the gun inside the store.

{¶ 44} The robber's behavior generally was consistent among all the robberies – the man entered the store, went behind the counter, displayed the gun, obtained cash, went back the way he came, and fled the store.   Only paper money was taken; the coins were left behind.   In several surveillance videos, the robber can be seen taking money from the registers with his right hand and placing the cash in his sweatshirt pockets.   He also can be seen shaking his sleeve down to cover his hand.   The surveillance videos did not have audio, but Detective Curley testified that the robber of both Family Dollar

stores (April 20 and July 1) said similar commands to the cashiers, specifically, "Give me everything." Tonia Smith likewise stated in her 911 call for the third robbery that the robber told her to give her everything.

**{¶ 45}** Although witnesses from the different stores provided various heights for the robber, Detective Curley went to the stores and measured the stickers on the security scanners by the doors. Curley then reviewed the surveillance videos and compared the height of the robber against his measurements. The detective determined that the robber was 5'10" or 5'11" tall. Detective Curley testified that he met Wright on July 10 and that Wright is 5'11" tall.

**{¶ 46}** The State presented the surveillance videos for each of the robberies, and the jury was able to view the perpetrator's appearance, mannerisms, and behavior during each robbery. In addition, the jurors heard the 911 calls and the testimony of the witnesses. It was the province of the jury to assess the witnesses' credibility and determine whether the State proved, beyond a reasonable doubt, that Wright committed each of the robberies. Although there was evidence from which the jury could have questioned whether the same person committed each of the robberies, we cannot conclude that the jury lost its way in finding that Wright committed the four robberies on April 20, June 10, and July 10.

**{¶ 47}** Wright's second assignment of error is overruled.

### III. Prosecutorial Misconduct

**{¶ 48}** In his third assignment of error, Wright claims that the prosecutor engaged in misconduct when she elicited testimony from the DNA forensic analyst that suggested that Wright had a prior conviction.

**{¶ 49}** When reviewing a claim of prosecutorial misconduct, we must determine whether the prosecutor's conduct was improper and, if so, whether that conduct prejudicially affected the defendant's substantial rights. *State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶ 115; *State v. St. John*, 2d Dist. Montgomery No. 27988, 2019-Ohio-650, ¶ 109-110, citing *State v. Martin*, 2d Dist. Montgomery No. 22744, 2009-Ohio-5303, ¶ 15. "A prosecutor's conduct during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial." *St. John* at ¶ 109; *State v. Williams*, 2d Dist. Montgomery No. 24548, 2012-Ohio-4179, ¶ 51, citing *State v. Apanovitch*, 33 Ohio St.3d 19, 24, 514 N.E.2d 394 (1987). "The touchstone of due process analysis * * * is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); *Kirkland* at ¶ 115.

**{¶ 50}** "Where it is clear beyond a reasonable doubt that the trier of fact would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed." *St. John* at ¶ 110. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

**{¶ 51}** In addition, curative instructions are given as a means of remedying errors or irregularities that occur during trial. *State v. Green*, 2d Dist. Montgomery No. 28614, 2020-Ohio-5206, ¶ 86, citing *State v. Artis*, 2019-Ohio-2070, 137 N.E.3d 587, ¶ 50 (3d Dist.). We generally presume that a jury will follow the trial court's limiting instructions concerning the evidence that may be considered and for what purpose, as well as curative

instructions to disregard testimony. *Id.* at ¶ 87, citing, *e.g., State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 93.

**{¶ 52}** On May 31, 2020, the day before trial, Wright filed a motion in limine, asking the trial court to prohibit the State from presenting, among other things, evidence that he had a prior criminal record (which included a prison sentence). Wright postulated that the State would likely present evidence that a DNA sample was obtained from him in 2017 when he was convicted and sent to prison. That 2017 DNA sample was used to match DNA found on the sweatshirt in this case.

**{¶ 53}** Prior to opening statements, the trial court and the parties addressed the motion in limine outside the presence of the jury. The court confirmed with defense counsel that he was asking that information about *how* Wright's DNA was entered into the database not be presented at trial. The court asked the prosecutors how they planned to avoid this information. The prosecutor responded that the State would avoid the timeline of events and not say "CODIS [Combined DNA Index System] hit." The prosecutor continued: "[I]f the timeline of events is not challenged we plan on indicating he became a suspect [and] it was confirmed by DNA later on." The State reserved the right to clarify the timeline of the DNA analysis if the timeline were challenged under cross-examination.

**{¶ 54}** During defense counsel's cross-examination of Detective Ellis on the second day of trial, defense counsel established that Ellis met with Wright and obtained a DNA sample. Counsel then asked Ellis when that had occurred. Ellis responded that he did not recall the date. (Tr. at 335.) The prosecutor then asked to approach the bench and told the court that the questioning was getting into the entry of Wright's DNA

into CODIS.   An extensive sidebar conversation about Wright's DNA samples followed.

{¶ 55} The parties and the court discussed whether the State could elicit evidence about how Wright was developed as a suspect.   The court expressed to the prosecutor that the State could address how Wright became a suspect without establishing how Wright's DNA was placed in the database.   (Tr. at 339.)   The court explained that the State could say that the sweatshirt was swabbed and compared, and a suspect was identified.   (Tr. at 341.)   Defense counsel agreed that that State "should be allowed to say that they used a sample of Mr. Wright's DNA [to develop a suspect].   But I just don't want them [the jury] to even know where it came from.   So as long as they [the State] just don't say where it came from."   (Tr. at 343.)   The court ultimately summarized: "They [the State] are allowed to say that prior to July 10th that the crime lab was able to process the evidence and develop a suspect (indiscernible) based on the evidence that was submitted."   (Tr. at 344.)

{¶ 56} The next day, Schepeler testified about his testing of DNA samples from the "Self Made" sweatshirt submitted by Detectives Curley and Ellis.   Schepeler told the jury that BCI has "a database that we use and we can put DNA profiles from items of evidence and those profiles are searched against one another within the database to potentially identify someone that may have contributed the DNA to the sample."   (Tr. at 381.)   Schepeler stated that the DNA profiles of the major contributors of the DNA from the collar area of the sweatshirt were entered into the database for comparison, and there was a "hit" on Wright.   Schepeler testified, without objection, that Wright's DNA was already stored in the database.   (*Id.*)

{¶ 57} Schepeler next testified that when a DNA sample has not been submitted

directly to BCI's Case Work Section, BCI would request the agency (e.g., police department) to collect a DNA standard and submit it for an additional comparison between the evidence and the standard.  Turning to Wright's situation, the prosecutor then asked, without objection:

Q:  Now, in this case, was it a little more unique to the point that there was a previous standard that was actually submitted directly to BCI?

A:  Yes, directly to our Case Work section.

Q:  And was that submitted by the Riverside Police Department back on August 4th of 2017?

A:  Yes.

Q:  And what were you able to do with that information?

A:  Since that DNA standard had already been submitted for case work purposes, we had electronically stored the DNA profile from the item so even though it's from 2017, I'm still able to go back onto our server where all of the data is stored and I'm able to pull up that DNA profile and actually use that for a comparison despite us not receiving a, quote-unquote, new standard.

Q:  And did you perform the DNA comparison we described earlier in your testimony, the fourth step, on the Riverside 2017 standard?

A:  So that process had already by completed back in 2017, when that item was reported to Riverside, so I didn't actually go through that entire process. Basically, I reviewed the underlying data and controls and all of that but the DNA profiles had already been generated so the process had been done a

couple years prior.

Q: And did you compare that to then the sweatshirt DNA?

A: Yes.

Q: And what results did you obtain from that?

A: Vincient Wright was included as one of the major contributors for both

the sample from the tag and the sample from the collar of the sweatshirt.

(Tr. at 382-383.) After discussing these results further, Schepeler testified that a new DNA standard for Wright was submitted, and he again compared the DNA profiles from the sweatshirt against the new standard, which confirmed the prior results.

{¶ 58} In light of the trial court's rulings regarding the development of a suspect, the prosecutor exceeded the permissible scope of direct examination when he asked Schepeler about how Wright's DNA initially was entered into the database. Nevertheless, considering the trial as a whole, we cannot conclude that Wright was denied a fair trial due to evidence that a DNA standard had been submitted to BCI in 2017 by the Riverside Police Department. Although Schepeler's testimony indicated that Wright had prior contact with the police, the jury was not informed of the basis for and the outcome of that contact, including whether Wright had any prior convictions.

{¶ 59} Moreover, prior to closing arguments, the trial court provided a limiting instruction to the jury regarding Schepeler's reference to the Riverside Police Department's submission of Wright's DNA standard to BCI. The court stated:

During the testimony this morning of Logan Schepeler, the forensic scientist, he testified that when completing his initial DNA analysis on the hooded sweatshirt in Exhibit 4Q, he made reference to a 2017 Riverside

case. You can give this part of his testimony no consideration and you should not consider it in any manner except that it may be considered for the fact that he completed DNA analysis in this case. All other parts of his testimony you may consider in the normal course of your deliberations in accordance with the instructions I'm about to read to you. * * *

(Tr. at 454.)

{¶ 60} Although the presumption of a jury following a limited curative instruction may be overcome, we do not find that the brief reference to Wright's providing a DNA sample to the Riverside Police Department was so inflammatory that it could not be ignored.

{¶ 61} Wright's third assignment of error is overruled.

### IV. Ineffective Assistance of Counsel

{¶ 62} In his first assignment of error, Wright claims that his trial counsel rendered ineffective assistance in five respects. He argues that his counsel was deficient in failing to (1) file a motion to suppress the identification by Rodney Howell, (2) investigate the identity of an employee-witness at the first robbery, (3) object to Stroope's testimony regarding surveillance video, (4) object to references to the robber as "defendant," and (5) object to the CODIS-related identification of Wright.

{¶ 63} To establish ineffective assistance of counsel, a defendant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the case would have been different. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984);

*State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.). Trial counsel is also entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 689.

*A. Motion to Suppress*

{¶ 64} Wright first argues that his trial counsel should have filed a motion to suppress the identification by Howell. The failure to file a suppression motion is not per se ineffective assistance of counsel. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000); *State v. Craver*, 2d Dist. Montgomery No. 28748, 2020-Ohio-5407, ¶ 30. Rather, "[t]he failure to file a motion to suppress constitutes ineffective assistance of counsel only when the record establishes that the motion would have been successful if made." *State v. Wallace-Lee*, 2d Dist. Greene No. 2019-CA-19, 2020-Ohio-3681, ¶ 53.

{¶ 65} A pretrial identification derived from inappropriately suggestive procedures which cause a substantial likelihood of misidentification violates a defendant's right to due process. *Neil v. Biggers*, 409 U.S. 188, 196-198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *State v. Kelly*, 2d Dist. Clark No. 2020-CA-8, 2021-Ohio-325, ¶ 12.

{¶ 66} "Courts apply a two-step test to determine the admissibility of a challenged identification. First, the defendant must show that the identification procedure was unduly suggestive. We have recognized that a show-up identification procedure, which involves showing just one individual to an eyewitness, as opposed to a lineup of different

individuals, is inherently suggestive. *E.g., State v. Henderson*, 2d Dist. Montgomery No. 28241, 2020-Ohio-6, ¶ 20; *State v. Martin*, 127 Ohio App.3d 272, 277, 712 N.E.2d 795 (2d Dist.1998).

**{¶ 67}** When a defendant shows that the pretrial identification procedure was unduly suggestive, the court must then consider whether the identification, viewed under the totality of the circumstances, was reliable despite the suggestive procedure. *See Williams* at ¶ 13. In reviewing the likelihood that the circumstances resulted in a misidentification, courts have considered the opportunity of the witness to view the perpetrator at the time of the offense, the witness's degree of attention, the accuracy of the witness's prior description of the perpetrator, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Biggers* at 199-200; *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Bates*, 110 Ohio St.3d 1230, 2006-Ohio-3667, 850 N.E.2d 1208, ¶ 8. (We have previously commented that some of the factors identified in *Biggers* may bear reconsideration in light of the significant advancement of scientific understanding of memory. *E.g., State v. Green*, 2d Dist. Montgomery No. 28614, 2020-Ohio-5206, ¶ 21, fn. 1.) Nevertheless, "[a]gainst these factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson* at 114.

**{¶ 68}** Reliability of the pretrial identification is the linchpin in determining its admissibility. *Id.* "So long as the identification possesses sufficient aspects of reliability, there is no violation of due process." *State v. Sherls*, 2d Dist. Montgomery No. 18599, 2002 WL 254144, *3 (Feb. 22, 2002); *Green* at ¶ 22. Accordingly, "an individual show-up identification procedure may survive constitutional challenge if there is evidence that

it is sufficiently reliable." *Martin* at 277.

{¶ 69} In this case, the detectives showed Howell a still photograph of Wright from surveillance video of the fourth robbery. Although Howell was not present at any of the robberies, the nature of the inquiry reasonably suggested that the individual in the photograph was of interest to the police. Detectives Ellis and Curley had already received the email from BCI with DNA results from the sweatshirt, identifying Wright as a contributor to the DNA. The detectives thus knew that Wright was a suspect in the robbery when they showed the photograph to Howell.

{¶ 70} Even assuming that the detective's procedure was unduly suggestive, the totality of the circumstances indicated that the identification was reliable. Howell testified at trial that he knew Wright through his employment and that the two men had met for an hour each on four or five occasions. Howell previously had spoken with Wright on the phone and knew Wright's address. In short, Howell was familiar with Wright prior to the identification, and Howell's testimony indicated that Howell was able to identify Wright on sight. Wright's testimony at trial reflected that he was certain of his identification. There is no information in the record that the detectives suggested to Howell, prior to the identification, that Wright was the person depicted in the still photograph. Although the surveillance video of the Salem Avenue Dollar General showed the robber's face from an angle, that fact is more relevant to the weight to be given to the identification, not its admissibility. On this record, we cannot conclude that a motion to suppress Howell's identification would have been successful. Consequently, trial counsel was not ineffective when he did not file a motion to suppress the identification of Wright.

*B. Failure to Identify Potential Witness*

{¶ 71} Wright next claims that his trial counsel acted deficiently by failing to identify a store employee at the Family Dollar on Wayne Avenue who had information that was potentially favorable to the defense.

{¶ 72} During the cross-examination of Officer Victor regarding the first robbery, defense counsel asked the officer if he had received a description of the robber. During follow-up questioning, defense counsel asked, "Did any of them say that they felt his [the robber's] voice was familiar?" Officer Victor responded, "There was a store clerk who said that his voice possibly sounded familiar." (Tr. at 161.) When counsel next asked if the employee indicated who that person might be, the prosecutor objected on hearsay grounds.

{¶ 73} The court and counsel discussed the objection at sidebar. The court asked defense counsel if he planned to call the store clerk, to which counsel responded "no." The court made an initial ruling that he was asking for hearsay. Defense counsel asserted that the clerk's statement was a present sense impression, as it was made to an officer shortly after the robbery occurred, and that the clerk stated that she thought that the robber was "some guy named August that she knows." The prosecutor countered the clerk's statement was not an excited utterance and was speculative. The court again expressed concern that the clerk's statement was hearsay and asked if defense counsel could call her to testify. Defense counsel indicated that he did not know the clerk's identity, because the police report "just indicates someone told him that."

{¶ 74} After a brief recess to research that matter, the trial court sustained the State's objection, ruling the clerk's statement was not a present sense impression. The court told defense counsel, "You cannot ask him [Officer Victor] anything about the store

clerks['] saying that it may have been an 'X' individual or it may have sounded like someone that I know named 'X' or someone that I recognize named 'X.' "

**{¶ 75}** Even assuming, for sake of argument, that counsel should have investigated the employee's identity and questioned the employee about the perpetrator's voice, the record does not reflect how that employee would have testified at trial. We cannot speculate what information she would have provided had she testified. Accordingly, Wright has not shown that a reasonable probability exists that the outcome of his trial on Count 1, the first robbery, would have been different had defense counsel identified the employee and called her to testify.

*C. Failure to Object to Witness's Testimony regarding Surveillance Video*

**{¶ 76}** Third, Wright claims that his trial counsel rendered ineffective assistance by failing to object to Sommer Stroope's testimony about what occurred on the surveillance video at her store, the Dollar General store at 2310 North Main Street. Wright argues that Stroope was uncertain whether the video accurately displayed what occurred during the third robbery, and thus the video was not properly authenticated. Wright contends that the surveillance video and corresponding photographs were improperly displayed to the jury and admitted as evidence, to his prejudice.

**{¶ 77}** Authentication is governed by Evid.R. 901. "Evid.R. 901(A) requires, as a condition precedent to the admissibility of evidence, a showing that the matter in question is what it purports to be." *State v. Simmons*, 2d Dist. Montgomery No. 24009, 2011-Ohio-2068, ¶ 12. "The threshold standard for authenticating evidence is low, meaning that the party seeking to introduce the disputed evidence need only demonstrate 'a reasonable likelihood that the evidence is authentic.' " (Citations omitted.) *State v.*

*Shropshire*, 2d Dist. Montgomery No. 28659, 2020-Ohio-6853, ¶ 11. Evid.R. 901(B) provides examples of several ways that the authentication requirement may be satisfied. The most commonly used method is oral testimony that a matter is what it is claimed to be under Evid.R. 901(B)(1). E.g., *State v. Quarles*, 2015-Ohio-3050, 35 N.E.3d 616, ¶ 34 (2d Dist.); *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 30.

{¶ 78} Stroope, the assistant manager at the 2310 North Main Street Dollar General store, testified that after she was alerted that the store had been robbed, she went into the office to gather the surveillance video for responding officers to review. When the officers arrived, Stroope "directed them to the office because I had everything up on view so they could see exactly what happened." (Tr. at 205.) Stroope stated that she worked with Detective Orick, with whom she had previously worked regarding surveillance at the store. Stroope and Orick reviewed the surveillance video.

{¶ 79} The prosecutor and Stroope had the following exchange about the video.

Q: * * * did the cameras in the store accurately depict what's going on in the store?

A: I believe they did.

Q: And did the video that you reviewed accurately depict what was going [sic] in the store?

A: Yes, ma'am.

* * *

Q: And you previously stated that [the surveillance video] accurately depicts what occurred that day?

A: I believe it does. I don't know if it – I mean – yes. I mean to my

knowledge, as of now, I believe it does.

Q:   What would make you say it didn't?

A:   Well, it's just been so long, you know, and my memory but it should from what I recall watching it, it should have the basic information of the robbery on there.

(Tr. at 206-207.)

{¶ 80} The prosecutor then showed Stroope several photographs of the store, Exhibit 3C-E.   Stroope testified that the photographs accurately reflected the state of the store on the date of the robbery.   The prosecutor then played the surveillance video, without objection.   Stroope described certain events as they occurred on the screen, and she indicated that other camera angles were not downloaded from the system.   When asked if "what you saw on there was accurate as it was recorded," Stroope replied, "Yes, ma'am."   (Tr. at 212.)

{¶ 81} Detective Orick testified after Stroope.   He stated that he had prior experience with the surveillance system at that store, and when he arrived there after the robbery, "[t]he store manager gained access to me into the office and then I immediately began to sit down and manipulate the camera system."   (Tr. at 221.)   After the prosecutor played part of the surveillance video for the detective, Orick testified that he remembered watching that video immediately after responding to the scene.   He further stated that the video was a "fair and accurate" depiction of what he viewed on the day of the robbery.

{¶ 82} Stroope's and Detective Orick's testimony was sufficient to authenticate the surveillance video of the robbery of the Dollar General store at 2310 North Main Street.

Due to the passage of time since the robbery, Stroope was somewhat equivocal when she initially was asked if the footage accurately displayed what had occurred. However, after viewing the video, she stated that the video accurately reflected what had been recorded on the day of the robbery. Detective Orick likewise confirmed during his testimony that the video played at trial was an accurate recording of what he reviewed immediately after the robbery occurred. Defense counsel did not render ineffective assistance when he failed to object to the admission of the surveillance video and Stroope's testimony.

*D. Failure to Object to References to the Suspect as "Defendant"*

{¶ 83} Fourth, Wright claims that his counsel should have objected when the prosecutor referred to the robber as the "defendant." Wright argues: "This is not a trivial point, as jurors were invited early-on in the testimony to identify the 'suspect' with the 'defendant.' Having this somewhat subtle psychological mental impression is of great significance."

{¶ 84} Wright cites to one instance where this occurred – during the testimony of Kiel Hegemier, the second witness at trial. During the State's redirect examination, Kiel testified that he concluded, after conversations with his father, that he was mistaken in his initial estimation of the perpetrator's height. The prosecutor then asked:

Q: How long were you actually exposed to the *defendant*? How long did you see him?

A: Just the duration of the robbery. I don't know. A few minutes, a couple minutes maybe at most.

(Emphasis added.) (Tr. at 139.)

{¶ 85} We cannot conclude that trial counsel's decision not to object was ineffective. Trial counsel could have reasonably concluded that this isolated reference to the robber as "the defendant" would have little effect on the jury and that an objection would merely serve to highlight the reference. Counsel's decision not to object to the prosecutor's phrasing was a matter of trial strategy, which generally does not constitute ineffective assistance of counsel. Moreover, we find no reasonable probability that the outcome of Wright's trial was affected by the prosecutor's phrasing of this single question.

E. *Failure to Object to CODIS-related Identification*

{¶ 86} Fifth, Wright claims that his trial counsel acted deficiently by failing to object to three sets of questions regarding the CODIS database and the presence of his DNA in that database. Wright argues that jurors could have concluded from that evidence that the police identified him from a DNA standard submitted to BCI by the Riverside Police Department due to additional criminal activity in 2017.

{¶ 87} The first set of questions occurred during Detective Ellis's testimony. At the beginning of Ellis's redirect examination, the prosecutor stated that he wanted to "clear up the timeline real quick." Ellis then described how he and Detective Curley delivered the sweatshirt to BCI on June 12, 2019 and received notice from BCI on July 10 that there was a match to Wright. The prosecutor then asked Ellis what the police do to confirm initial DNA test results. Ellis responded:

A:   When the suspect that they are given the name of gets taken into custody. We then collect DNA and submit it to BCI for comparison.

Q:   And is that unique to this case or is this a –

A:   It's every case.

*Q:* So they do an initial hit, for the lack of better word, and then you get a confirmation DNA swab and you submit it and like BCI tests it again.

A: Correct. They –

Q: Actually they probably request it from you, right? They're not telling you to do anything.

*A: Yeah. They'll submit what their finding is into the CODIS database.*

*Q: And I'm going to scratch that from the record.*

A: Sure.

Q: So they – you just – you get a second – you ask them to retest it.

A: That's correct.

(Emphasis added.) (Tr. at 351-352.)

{¶ 88} The second and third sets of questions occurred during Schepeler's testimony. Wright claims that defense counsel should have objected to a series of questions regarding BCI's initial findings. Specifically, he challenges the following question: "And now in order for you to have a forensic hit, would that have meant Vincent Wright's DNA was already stored in the database?" (Tr. 381.) Wright also asserts that defense counsel should have objected to the series of questions in which the prosecutor elicited testimony that a sample of Wright's DNA had been submitted to BCI by the Riverside Police Department in 2017. (Tr. 382-383, quoted infra.)

{¶ 89} Beginning with the second series of questions, we find nothing improper about the prosecutor's question. The State had the burden to establish that Wright was the perpetrator of the robberies of which he was charged, and the presence of Wright's DNA linking him to evidence obtained in the investigation was central to its evidence on

that issue. The State reasonably elicited testimony that Schepeler compared DNA samples obtained from the "Self Made" sweatshirt against a "database" of DNA profiles and that Wright's DNA was in the database. Nothing in that testimony suggested the source of the DNA profiles in the database or that Wright had previously engaged in criminal activity. Defense counsel did not act deficiently in failing to object to these questions.

{¶ 90} Detective Ellis's testimony identified the database as the "CODIS database." The term "CODIS" was not defined for the jury, nor was the jury informed that the database included a collection of DNA profiles of individuals who committed certain criminal offenses. We do not find that a reasonable probability exists that the outcome of Wright's trial was affected by this passing reference to CODIS.

{¶ 91} Furthermore, upon hearing Ellis's answer, the prosecutor stated that he was going to "scratch that from the record." Although the State had previously indicated that it would avoid any references to CODIS, trial counsel could have reasonably concluded that the prosecutor's response to Ellis's answer adequately addressed the improper reference to CODIS and that any additional objection would merely have served to emphasize the answer for the jury. Defense counsel's failure to object was a reasonable trial strategy.

{¶ 92} As for the questions related to how BCI received Wright's first DNA standard, the prosecutor's questions indicated to the jury that Wright had prior contact with the police, during which the Riverside Police Department collected his DNA. Even assuming, however, that counsel should have objected to this series of questions, we cannot conclude, upon consideration of the trial as a whole, that counsel's failure to object

was prejudicial, particularly given the trial court's limiting instruction regarding Schepeler's references to the Riverside Police Department.

{¶ 93} Wright's first assignment of error is overruled.

## V. Cumulative Error

{¶ 94} Finally, Wright claims that the cumulative effect of all the purported errors deprived him of a fair trial.

{¶ 95} The cumulative error doctrine states that a conviction will be reversed where "the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). This doctrine, however, only applies where there are "multiple instances of harmless error." *Id.* Accordingly, for the cumulative error doctrine to apply, we must find that (1) multiple errors were committed at trial, and (2) there is a reasonable probability that but for the multiple errors, the outcome of the trial would have been different. *State v. Freeman*, 2d Dist. Greene No. 2020-CA-33, 2021-Ohio-734, ¶ 61; *State v. Goldblum*, 2d Dist. Montgomery No. 25851, 2014-Ohio-5068, ¶ 58.

{¶ 96} Wright has not demonstrated that multiple errors occurred. Consequently, we cannot conclude that his convictions should be reversed due to cumulative error. Wright's fourth assignment of error is overruled.

## VI. Conclusion

{¶ 97} The trial court's judgment will be affirmed.

. . . . . . . . . . . .

TUCKER, P. J. and WELBAUM, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
David E. Stenson
Hon. Mary E. Montgomery