[Cite as *In re L.S.*, 2021-Ohio-3353.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE L.S.

A Minor Child

No. 110351

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART; VACATED IN PART; REMANDED

**RELEASED AND JOURNALIZED:** September 23, 2021

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL-20-103818

### *Appearances:*

Fred D. Middleton, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Margaret Graham, Assistant Prosecuting Attorney, *for appellee.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Defendant-appellant L.S. appeals his adjudications of delinquency on one count of aggravated robbery, three counts of robbery, one count of grand theft and one count of criminal damaging or endangering. L.S. contends that he was denied the effective assistance of counsel based on trial counsel's failure to file a motion to suppress, or to object to, evidence of (1) a victim's "cold-stand"

identification and (2) surveillance video footage of the incident. L.S. also appeals his dispositions for robbery and grand theft on the grounds that they are allied offenses of similar import to aggravated robbery.

**{¶ 2}** For the reasons that follow, we affirm L.S.'s adjudications of delinquency but vacate the dispositions on Counts 1-5 and remand for resentencing on those counts. We also remand for the juvenile court to issue a nunc pro tunc entry correcting its January 25, 2021 dispositional journal entry to reflect that a $100 fine (suspended) was imposed on Count 6, not a $400 fine (suspended), as stated in the journal entry.

**Factual Background and Procedural History**

**{¶ 3}** On April 1, 2020, the state of Ohio filed a delinquency complaint in juvenile court charging L.S. as a juvenile offender on six counts: aggravated robbery in violation of R.C. 2911.01(A)(1) (Count 1), robbery in violation of R.C. 2911.02(A)(1) (Count 2), robbery in violation of R.C. 2911.02(A)(2) (Count 3), robbery in violation of R.C. 2911.02(A)(3) (Count 4), grand theft in violation of R.C. 2913.02(A)(1) (Count 5) and criminal damaging or endangering in violation of R.C. 2909.06(A)(1). The aggravated robbery, robbery and grand theft counts included one-year and three-year firearm specifications. The charges related to a March 31, 2020 incident in which L.S. allegedly threatened a 12-year-old boy, J.S., with a gun, stole a set of car keys J.S. was carrying and then gave the car keys to an associate, who drove off in, and ultimately crashed, the vehicle. L.S. was 14 years old at the time of the incident. L.S. denied the charges against him. An adjudicatory hearing

was held on November 3, 2020. A summary of the evidence presented at the hearing follows.

{¶ 4} In the late afternoon or early evening hours of March 31, 2020, J.S., J.S.'s mother, J.P., and one of his mother's friends, M.G., returned home after running some errands. M.G. parked her vehicle, a white 2008 Mercury Mariner, in the parking lot of J.P.'s apartment complex on Detroit Avenue in Cleveland, Ohio and J.S. and the two women carried their purchases inside. Realizing that a bag of groceries had been left behind in M.G.'s car, J.S. went back out to the car to retrieve the groceries. J.S. testified that when he went back outside, three male youths approached him — one was wearing "[r]ed pants and a black sweater," one was wearing all black (the "perpetrator wearing black") and one was wearing a grey sweater or jacket and black pants (the "perpetrator wearing grey"). J.S. stated that he "knew of" two of the males and had seen them in the area before but that he was not friends with any of them. J.S. testified that the male who was wearing red pants and a black sweater (whom J.S. identified in court as L.S.) had a gun in his hand and pointed it at J.S. — by his stomach — and that the perpetrator wearing grey had a gun in his pocket. J.S. stated these two males were wearing black "ski masks."

{¶ 5} J.S. testified that the males first demanded that J.S. give them the car keys he was carrying and then demanded that he identify the vehicle to which the car keys belonged. Each time, they told J.S. that if he did not comply, they would shoot him. J.S. complied. He handed the car keys to L.S. and told him that the keys were for the "white car." J.S. stated that he gave L.S. the car keys because he "didn't

want to die." L.S. then gave the car keys to the perpetrator wearing grey, who got into M.G.'s car and drove the vehicle until it struck a curb and became inoperable. After giving the car keys to L.S., J.S. ran back to his apartment, "nervous and crying," and told his mother and M.G. what had happened.

{¶ 6} J.P. immediately went outside. M.G. grabbed her cell phone to call 911 and followed J.P. outside. J.P. testified that when she went outside, she saw several kids in the alley and someone driving M.G.'s vehicle. J.P. followed the vehicle down the alley. As she reached the end of the alley, the vehicle hit a curb and the driver jumped out of the vehicle and fled, on foot, down the street. J.P. testified that, at that time, she saw a boy (whom she identified in court as L.S.) wearing "red khaki, like reddish pants" and a black hoodie standing at the end of the alley along with several other kids. J.P. testified that she asked the kids in the alley what was going on and that L.S. told her that he "didn't have anything to do with it." L.S. and the other kids then ran off. J.P. testified that approximately "one to five minutes" later, L.S. returned to get a bicycle that had been left in the alley and then rode off on the bicycle. When J.S. saw L.S. on the bicycle, he recognized him and told his mother that L.S. was one of the males who had robbed him.

{¶ 7} M.G. testified that when she got outside, she saw her car in the middle of the street. She walked over to her car but was unable to move it because "[t]he tire was messed up." The vehicle had to be towed from the scene. M.G. stated that she was still on the phone with the 911 dispatcher when the police arrived.

{¶ 8} Cleveland Police Detective Daniel Florentz, the "lead" officer on the case, was one of the responding officers. He testified that as he approached the scene, he saw a white Mercury Mariner in the middle of the road on Detroit Avenue near W. 87th Street. He indicated that officers in a zone car that was already on scene were providing updates to other responding officers and reported that two males possibly connected to the incident — one wearing "maroon pants" and another wearing a grey jacket or hoodie — were heading northbound on W. 87th Street. Detective Florentz testified that officers detained one male (whom he identified in court as L.S.) riding a bike on W. 87th Street, a couple hundred feet from the scene of the incident. Detective Florentz indicated that when he was apprehended, L.S. was wearing "maroon pants and a black zip-up hoodie" with "a red like Louis Vuitton belt" and had a "black hood with a black mask * * * that has a face cut out on it" on his person.[1] He said that officers were unable to locate the second male. Detective Florentz indicated that no weapons were found on L.S. when he was apprehended and that no weapons were found during a search of the surrounding area.

{¶ 9} Detective Florentz testified that after L.S. was apprehended, he was placed in the back of a zone car while officers spoke with J.S. He stated that J.S. was "shaken up" but was "very knowledgeable" and "could describe a lot of details from

---

[1] The mask with the "face cut out on it" that the police took from L.S. when he was apprehended was identified by Detective Florentz and admitted into evidence as an exhibit.

the incident."  He indicated that J.S.'s description of one of the perpetrators, including the mask found on L.S., matched L.S.

{¶ 10}  Detective Florentz testified that, after speaking with J.S., he brought J.S. over to where L.S. was being detained and conducted a "cold-stand."  He "blocked" J.S. "off" so he would not be seen by L.S., had L.S. step out of the police vehicle and asked J.S. if he could identify L.S. as one of the males involved in the incident.  Detective Florentz testified that J.S. indicated that L.S. was one of the males who had robbed him.

{¶ 11}  Detective Florentz stated that he interviewed L.S. after the incident and that L.S. claimed that he was headed over to a friend's house when his cell phone "died."  According to Detective Florentz, L.S. stated that he saw a group of individuals he knew as "associates" in the alley and stopped and talked to them a bit.  L.S. claimed that when he saw J.S., he ran up J.S. to tell J.S. that he wanted to talk to his sister because he had a crush on her.

{¶ 12}  Surveillance cameras around the parking lot of the apartment complex captured the incident.  Detective Florentz testified that, after the incident, police recovered surveillance footage from "multiple cameras at the location" and that he reviewed all of "the multiple different angles * * * from that day."

{¶ 13}  Portions of that video footage were played during the testimony of J.S., M.G., and Detective Florentz and were introduced into evidence on a compact disc (the "video CD").  The video CD contains two minutes and three seconds of

surveillance video footage from various camera angles and includes date and time-stamps.

{¶ 14} The video CD begins with video footage of a boy (identified in court as J.S.) walking into the parking lot and several other male youths — including a male wearing a black hoodie and red pants (identified in court as L.S.), an unidentified male wearing a grey jacket, an identified male wearing all black and an unidentified male wearing a blue-and-white jacket — standing or sitting in an alley on the other side of the parking lot. As J.S. walks through the parking lot, the male youths turn in his direction, watching him, then become animated, jumping around. The male wearing all black pulls up the hood of his hoodie and takes something from the male wearing the blue-and-white-jacket. Three of the youths — L.S., the male wearing a grey jacket and the male wearing all black — run towards J.S., with L.S. leading the way. As the three youths get closer to J.S., the male wearing all black tosses a gray or silver object to the male wearing the grey jacket. L.S. and the male wearing a grey jacket approach J.S. as he reaches the area where several cars are parked. The surveillance video shows the males interact with J.S. briefly, then L.S. and the male in the grey jacket move towards a white vehicle. The male in the grey jacket opens the door of the white vehicle, gets inside,[2] drives it out of the parking lot until the vehicle hits the curb and stops in the middle of the street. The male in

---

[2] During her testimony, M.S. identified her vehicle as the white vehicle depicted in surveillance video footage on the video CD.

the grey jacket gets out of the vehicle, abandons it in the middle of the street and runs from the scene in the opposite direction from the apartment complex.

{¶ 15} As the male in gray jacket got into the vehicle and drove it out of the parking lot, the surveillance video shows J.S. running back towards his apartment and L.S. running back towards the alley.

{¶ 16} J.S. identified the alley and parking lot depicted in the video CD as the alley and parking lot for his apartment complex where the incident occurred. J.S. also identified himself and L.S. in the surveillance video footage included on the video CD. As the state played the video CD during his testimony, J.S. described what was depicted in the video — i.e., J.S. walking to the car, the three males "running up" to him, the perpetrator in black tossing a gun to the perpetrator in grey who then handed the gun to L.S., J.S. backing up as L.S. pointed the gun at him, J.S. giving the car keys to L.S. and the perpetrator in grey getting into the car and driving out of the parking lot as J.S. ran back to his apartment. J.S. testified that he did not personally observe the perpetrator in black toss a gun to the perpetrator in grey; he only saw it on the surveillance video. He stated that he did, however, personally observe the perpetrator in grey "throw" a gun to L.S. as the males approached him, which L.S. then pointed at J.S.

{¶ 17} The state also played the video CD during Detective Florentz's testimony. Detective Florentz identified L.S. as the male wearing "maroon pants, black zip-up hoodie, black mask" observed in the surveillance video and described

what was depicted in the surveillance video,[3] i.e., an unidentified male in a white-and-blue jacket "hand[ing] off what appeared to be a gun" to an unidentified male in a black jacket who then "hands it off" to an unidentified male in a grey jacket, L.S. and the unidentified male in the grey jacket running up to J.S. "behind his vehicle as it's parked" and "like back[ing] [him] up against the car" and J.S. running back toward his apartment as "one of the suspects" enters the vehicle and drives it out of the parking lot and L.S. and the other males run back down the alley.

{¶ 18} Detective Florentz testified that the surveillance video footage on the video CD was "a fair and accurate depiction" of the surveillance footage police had recovered relating to the incident. He stated that the surveillance video footage was consistent with J.S.'s version of events but was not consistent with what L.S. had told him had occurred.

{¶ 19} L.S.'s trial counsel did not object to the video CD or to the witnesses' testimony relating to the surveillance video footage. L.S. did not present any witnesses at the hearing.

---

[3] Detective Florentz testified that the surveillance footage recovered by police also showed that prior to the incident, L.S. walked up to and knocked on the door of one of the apartments, that he talked with another male and that a few other males then came out of the apartment. He stated that the surveillance video footage then showed the males walk around the building into the alley, where they sat, smoking cigarettes and "just joking around laughing." He stated that the surveillance video footage also showed J.S. "coming home with his family," parking the vehicle and walking down to their apartment. None of this surveillance footage was included on the video CD that was played at the hearing and admitted into evidence as an exhibit.

{¶ 20} After considering the evidence presented, the juvenile court found that the allegations of the complaint had been proven beyond a reasonable doubt, and L.S. was adjudicated delinquent on all six counts.

{¶ 21} On January 21, 2021, the juvenile court held a dispositional hearing. At the dispositional hearing, the juvenile court found that the aggravated robbery, robbery and grand theft counts were allied offenses that merged for disposition and that the one-year firearm specifications merged with the three-year firearm specifications. On the aggravated robbery count, the juvenile court sentenced L.S. to a minimum two-year term in the Ohio Department of Youth Services, i.e., one year on the three-year firearm specification to be served prior to and consecutively to one year on the underlying offenses. On the criminal damaging or endangering count, the juvenile court sentenced L.S. to 78 days in the detention center, with credit for 78 days served. The juvenile court also imposed a $1,500 fine on the aggravated robbery count, a $400 fine on the grand theft count and a $100 fine on the criminal damaging and endangering count — all of which were suspended — and ordered L.S. to pay $250 in restitution to the victim. The juvenile court judge indicated that "[s]ince the Court found that Counts 2, 3 and 4 are allied offenses and they merge with Count 1, I will not impose a fine * * * on those."[4]

{¶ 22} On January 25, 2021, the juvenile court issued a written journal entry, setting forth its disposition of the case. The journal entry stated that L.S. was

---

[4] As noted above, although the juvenile court also found that Count 5, grand theft, merged with Count 1, it, nevertheless, imposed a $400 fine (suspended) on that count at the dispositional hearing.

"hereby committed to the Department of Youth Services for a period of 2 years" and set forth the sentences imposed on the individual counts as follows:

- As to Count 1, aggravated robbery — to ODYS for a minimum period of 12 months and a maximum period not to exceed L.S.'s attainment of 21 years of age, plus one year each on the three-year and one-year firearm specifications, to be served prior to and consecutive to the sentence on the underlying offense but concurrently to each other.

- As to Count 2, robbery — to ODYS for a minimum period of 12 months and a maximum period not to exceed L.S.'s attainment of 21 years of age, plus one year each on the three-year and one-year firearm specifications, to be served prior to and consecutive to the sentence on the underlying offense but concurrently to each other.

- As to Count 3, robbery — to ODYS for a minimum period of 12 months and a maximum period not to exceed L.S.'s attainment of 21 years of age, plus one year each on the three-year and one-year firearm specifications, to be served prior to and consecutive to the sentence on the underlying offense but concurrently to each other.

- As to Count 4, robbery — to ODYS for a minimum period of six months and a maximum period not to exceed L.S.'s attainment of 21 years of age, plus one year each on the three-year and one-year firearm specifications, to be served prior to and consecutive to the sentence on the underlying offense but concurrently to each other.

- As to Count 5, grand theft — to ODYS for a minimum period of six months and a maximum period not to exceed L.S.'s attainment of 21 years of age, plus one year each on the three-year and one-year firearm specifications, to be served prior to and consecutive to the sentence on the underlying offense but concurrently to each other.

- As to Count 6, criminal endangering — a 78-day sentence in the detention center, with credit given for 78 days.

The journal entry further stated that "[i]t is ordered that counts 2, 3, 4 and 5 are allied cases [sic] and these counts shall run concurrently with count 1."

{¶ 23} The journal entry set forth the fines imposed as follows:

> The child is ordered to pay fines in the amount of $1500.00 as to count (1) and [$]400.00 as to count (6). There is [sic] no fines assessed in counts 2, 3, 4 and 5 because these are considered allied offenses. It is further ordered that said fines are suspended.

{¶ 24} L.S. appealed, raising the following two assignments of error for review:

> Assignment of Error No. 1: The juvenile court erred in failing to merge appellant's adjudications and dispositions for aggravated robbery and robbery as "allied offenses of similar import" and * * * the failure to merge the adjudications violated the double-jeopardy protections contained in the United States and Ohio Constitutions.

> Assignment of Error No. 2: The trial counsel was ineffective by not filing motions to suppress the "cold-stand" and surveillance video and objecting to the use of that evidence in trial.

**Law and Analysis**

**Multiple Sentences on Allied Offenses**

{¶ 25} In his first assignment of error, L.S. contends that the juvenile court erred when it imposed separate sentences on the robbery and grand theft counts (Counts 2-5) after it determined that they were allied offenses of similar import and merged with the aggravated robbery count (Count 1). We agree.

{¶ 26} As the Ohio Supreme Court has stated, "juveniles are entitled to the same constitutional double-jeopardy protections as adults" and "juvenile courts must conduct the same double-jeopardy analysis in delinquency proceedings that other courts apply in adult criminal proceedings." *In re A.G.*, 148 Ohio St.3d 118,

2016-Ohio-3306, 69 N.E.3d 646, ¶ 1. This includes application of Ohio's merger statute. *Id.* at ¶ 11-12, 15 (observing that "[b]ecause the protections contained in R.C. 2941.25 encapsulate constitutional double-jeopardy protections, the language and principles of that statute can be applied to juveniles as well" and that "under the Ohio Constitution, a juvenile's double-jeopardy protections are violated when that juvenile is subjected to multiple terms of commitment for conduct constituting allied offenses of similar import").

{¶ 27} R.C. 2941.25, Ohio's merger statute, prohibits the imposition of multiple sentences for allied offenses of similar import. It provides, in relevant part:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

R.C. 2941.25(A). When a sentencing court determines that an offender has been found guilty of two or more offenses that are allied offenses of similar import, the state selects the allied offense on which the offender is to be sentenced and the court then impose a sentence on only that allied offense. *State v. Williams*, 148 Ohio St.3d 403, 2016-Ohio-7658, 71 N.E.3d 234, ¶ 2, 17 ("'[I]t is the state that chooses which of the allied offenses to pursue at sentencing,' * * * and '[w]hen the state elects which of the two allied offenses to seek sentencing for, the court must accept the state's choice and merge the crimes into a single conviction for sentencing.'"), quoting *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 20, 24.

{¶ 28} In this case, the transcript reflects that, at the dispositional hearing the juvenile court (1) determined that the aggravated robbery offense, the robbery offenses and the grand theft offense were allied offenses of similar import, (2) indicated that these counts would be merged for disposition and (3) sentenced L.S. on the aggravated robbery count. There is nothing in the record to indicate that the state elected that L.S. be sentenced on the aggravated robbery count as opposed to one of the other counts; however, the state does not appear to have objected to the juvenile court's determination that the offenses were allied offenses of similar import or its sentencing of L.S. on the aggravated robbery count as opposed to one of the other allied offense counts.

{¶ 29} At the dispositional hearing, the juvenile court determined that Counts 1-5 were allied offenses that merged and, therefore, imposed a sentence on only one of those counts,[5] the juvenile court's January 25, 2021 dispositional journal entry sets forth sentences on each of the five allied offenses, then orders that the sentences be served concurrently.

{¶ 30} The state asserts that because L.S.'s sentences for the allied offenses ran concurrently, he was "only punished for his delinquent actions a single time" and, therefore, "[j]eopardy occurred once, in compliance with the Ohio Revised Code, the Ohio Constitution and the Fifth Amendment." However, "the imposition

[5] Also, the juvenile court stated at the dispositional hearing that it would not impose a fine on Counts 2, 3 and 4 because they "are allied offenses and they merge with Count 1," it imposed a $400 fine (suspended) on Count 5 — even though it had previously determined that Count 5 also merged with Counts 1-4. Thus, the imposition of a fine on Count 5 was in error.

of concurrent sentences is not the equivalent of merging allied offenses of similar import." *Williams*, 148 Ohio St.3d 403, 2016-Ohio-7658, 71 N.E.3d 234, at ¶ 3, 34, citing *State v. Damron*, 129 Ohio St.3d 86, 2011-Ohio-2268, 950 N.E.2d 512, ¶ 17. Where a trial court has determined that an offender's multiples offenses are allied offenses of similar import, it cannot impose a separate sentence for each offense. *Williams* at ¶ 28. Rather, the trial court has "a mandatory duty to merge the allied offenses by imposing a single sentence." *Id.*; *see also State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 26 ("R.C. 2941.25(A) clearly provides that there may be only one conviction for allied offenses of similar import. Because a defendant may be convicted of only one offense for such conduct, the defendant may be sentenced for only one offense. * * * [A] trial court is prohibited from imposing individual sentences for counts that constitute allied offenses of similar import."); *cf. In re C.N.*, 8th Dist. Cuyahoga No. 107371, 2019-Ohio-179, ¶ 1-2, 5-6 (where, at sentencing, juvenile court determined that aggravated robbery and robbery counts merged into kidnapping counts but the journal entry reflected a juvenile disposition for each of the counts to be served concurrently, case remanded for "correction through a nunc pro tunc entry" to indicate that counts merged and to "reflect the proper punishment"). Thus, the juvenile court erred in setting forth concurrent sentences on Counts 1-5 in its journal entry.

{¶ 31} L.S.'s first assignment of error is sustained. L.S.'s dispositions on Counts 1-5 are vacated, and the matter is remanded to the juvenile court (1) to allow

the state to elect the allied offense on which it wishes L.S. to be resentenced and (2) for resentencing on that count.

### Ineffective Assistance of Counsel

{¶ 32} In his second assignment of error, L.S. contends that he was denied the effective assistance of counsel because trial counsel failed to file a motion to suppress or to object to evidence of (1) J.S.'s "cold-stand" identification of L.S. and (2) the video CD containing surveillance video footage of the incident.

{¶ 33} "The Sixth Amendment to the United States Constitution guarantees an accused juvenile the same rights to effective assistance of counsel as an adult criminal defendant." *In re M.B.*, 8th Dist. Cuyahoga No. 106434, 2018-Ohio-4334, ¶ 54, citing *In re Gault*, 387 U.S. 1, 41, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). To establish ineffective assistance of counsel, the represented party must demonstrate: (1) deficient performance by counsel, i.e., that counsel's performance fell below an objective standard of reasonable representation, and (2) that counsel's errors prejudiced the party, i.e., a reasonable probability that but for counsel's errors, the outcome would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus. "Reasonable probability" is "probability sufficient to undermine confidence in the outcome." *Strickland* at 694. L.S. has not met his burden here.

{¶ 34} In Ohio, every properly licensed attorney is presumed to be competent. *State v. Black*, 2019-Ohio-4977, 149 N.E.3d 1132, ¶ 35 (8th Dist.), citing

*State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Thus, in evaluating counsel's performance on a claim of ineffective assistance of counsel, the court must give great deference to counsel's performance and "indulge a strong presumption" that counsel's performance "falls within the wide range of reasonable professional assistance." *Strickland* at 689; *see also State v. Powell*, 2019-Ohio-4345, 134 N.E.3d 1270, ¶ 69 (8th Dist.) ("'A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"), quoting *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 69.

{¶ 35} The failure to file a motion to suppress is not per se ineffective assistance of counsel. *See, e.g., State v. Musleh*, 8th Dist. Cuyahoga No. 105305, 2017-Ohio-8166, ¶ 31; *State v. Watts*, 8th Dist. Cuyahoga No. 104188, 2016-Ohio-8318, ¶ 17, citing *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000). Rather, a trial counsel's failure to file a motion to suppress constitutes ineffective assistance of counsel only if there is a reasonable probability that, had the motion to suppress been filed, it would have been granted and that suppression of the challenged evidence would have affected the outcome of the case. *See, e.g., State v. Frierson*, 2018-Ohio-391, 105 N.E.3d 583, ¶ 17 (8th Dist.); *Musleh* at ¶ 31. Counsel is not required to file a motion to suppress if doing so would be a futile act. *See, e.g., Musleh* at ¶ 31; *State v. Armstrong*, 8th Dist. Cuyahoga No. 103088, 2016-Ohio-2627, ¶ 30; *State v. Moon*, 8th Dist. Cuyahoga No. 101972, 2015-Ohio-1550, ¶ 28 ("'Even if some evidence in the record supports a motion to suppress, counsel is still

considered effective if counsel could reasonably have decided that filing a motion to suppress would have been a futile act.'"), quoting *State v. Suarez*, 12th Dist. Warren No. CA2014-02-035, 2015-Ohio-64, ¶ 13; *State v. Brooks*, 11th Dist. Lake No. 2011-L-049, 2013-Ohio-58, ¶ 57 ("'If case law indicates the motion would not have been granted, then counsel cannot be considered ineffective for failing to prosecute it.'"), quoting *State v. Gaines*, 11th Dist. Lake Nos. 2006-L-059 and 2006-L-060, 2007-Ohio-1375, ¶ 17; *State v. Grimes*, 8th Dist. Cuyahoga No. 94827, 2011-Ohio-4406, ¶ 30 ("[W]here there is no basis for the suppression of evidence, defense counsel has no duty to pursue a motion to suppress evidence * * * and where the claim of ineffective assistance is premised upon the failure to file a baseless motion to suppress, such claim must fail."), citing *State v. Gibson*, 69 Ohio App.2d 91, 95, 430 N.E.2d 954 (8th Dist.1980).

{¶ 36} Likewise, the failure to object is not per se ineffective assistance of counsel. "'Objecting is a tactical decision.'" *Frierson* at ¶ 25, quoting *State v. Johnson*, 7th Dist. Jefferson No. 16 JE 0002, 2016-Ohio-7937, ¶ 46. As a general matter, defense counsel's tactical decisions and trial strategies, even "debatable" ones, do not constitute ineffective assistance of counsel. *See, e.g., State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101, 111; *Black*, 2019-Ohio-4977, 149 N.E.3d 1132, at ¶ 35; *State v. Foster*, 8th Dist. Cuyahoga No. 93391, 2010-Ohio-3186, ¶ 23. Reviewing courts "will ordinarily refrain from second-guessing strategic decisions counsel make at trial," even where trial counsel's strategy was "questionable" and even where appellate counsel asserts that he or she would have

defended against the charges differently. *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 152; *State v. Mason*, 82 Ohio St.3d 144, 169, 694 N.E.2d 932 (1998). As such, the failure to make an objection, is generally not, in and of itself, sufficient to sustain a claim of ineffective assistance of counsel. *Conway* at ¶ 103; *Frierson* at ¶ 25; *see also State v. Mitchell*, 53 Ohio App.3d 117, 119, 559 N.E.2d 1370 (8th Dist.1988) ("[A] trial attorney does not violate any substantial duty in failing to make futile objections.").

### Cold-Stand Identification

{¶ 37} In this case, L.S. contends that his counsel was ineffective for failing to file a motion to suppress or to object to evidence of J.S.'s cold-stand identification of L.S. because "[t]he evidence produced through a 'cold stand' was obtained under objectionable overly suggestive procedures used by the police."

{¶ 38} A "cold-stand" identification is "a pretrial identification procedure whereby the police have a suspect into custody and 'take him to be identified by a witness.'" *In re S.A.*, 8th Dist. Cuyahoga No. 107707, 2019-Ohio-4782, ¶ 30, quoting *In re T.H.*, 8th Dist. Cuyahoga No. 106433, 2018-Ohio-2300, ¶ 12. In considering the admissibility of a cold-stand identification, courts apply a two-prong test. *State v. Davis*, 8th Dist. Cuyahoga No. 101502, 2015-Ohio-1144, ¶ 19, 21. First, the defendant or alleged delinquent must show that the identification procedure was "so impermissibly suggestive as to give rise to a substantial likelihood of misidentification." *Id.* at 19-20; *In re T.W.*, 2017-Ohio-8875, 100 N.E.3d 1239, ¶ 6 (8th Dist.); *In re S.A.* at ¶ 31-32.

{¶ 39} If the defendant or alleged delinquent demonstrates that the identification procedure was impermissibly suggestive, the court must then determine whether the witness' identification, when viewed under the totality of the circumstances, was reliable despite the suggestive procedure, i.e., whether the witness' identification was reliable independent of the police conduct and procedure. *Davis* at ¶ 21; *In re T.W.* at ¶ 7, 16; *In re S.A.* at ¶ 32. When evaluating the reliability of a witness' identification, courts consider: (1) the witness' opportunity to view the perpetrator at the time of the offense; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the perpetrator; (4) the witness' level of certainty when identifying the suspect and (5) the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Davis* at ¶ 21; *In re T.W.* at ¶ 7; *In re S.A.* at ¶ 32.

{¶ 40} "Reliability" of the cold-stand identification is the "linchpin" in determining its admissibility. *State v. Wright*, 2d Dist. Montgomery No. 28831, 2021-Ohio-2133, ¶ 68. In other words, "[t]he purpose of the reliability inquiry is to determine whether the unduly suggestive nature of the identification was overcome by the reliability of the witness." *In re T.W.* at ¶ 16. "'So long as the identification possesses sufficient aspects of reliability, there is no violation of due process'" and evidence of the cold-stand identification is admissible. *Wright* at ¶ 68, quoting *State v. Sherls*, 2d Dist. Montgomery No. 18599, 2002 WL 254144, 3 (Feb. 22, 2002); *see also In re T.W.* at ¶ 7 ("'The focus is therefore upon the reliability of the identification

and not the identification procedures themselves.' * * * No one factor is dispositive."), quoting *Davis* at ¶ 18.

{¶ 41} As the Ohio Supreme Court has explained:

> "There is no prohibition against a viewing of a suspect alone in what is called a 'one-man showup' when this occurs near the time of the alleged criminal act; such a course does not tend to bring about misidentification but rather tends under some circumstances to insure accuracy. * * *

> "[P]olice action in returning the suspect to the vicinity of the crime for immediate identification in circumstances such as these fosters the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh."

*State v. Madison*, 64 Ohio St.2d 322, 332, 415 N.E. 2d 272 (1980), quoting *Bates v. United States*, 405 F.2d 1104, 1106 (D.C.Cir.1968); *see also In re S.A.,* 2019-Ohio-4782, at ¶ 33.

{¶ 42} L.S. does not identify what "overly suggestive procedures" he contends were used by police nor does he otherwise explain how the cold-stand identification was objectionable and why it should have been suppressed. Further, he fails to provide any citation to the record or authority to support his argument. *See* App.R. 16(A)(7) ("The appellant shall include in its brief * * * [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies."). "It is not the role of this court to make arguments for a party." *State v. Harris*, 8th Dist. Cuyahoga No. 109083, 2020-Ohio-4138, ¶ 31; *see also State v. Jacinto*, 2020-Ohio-

3722, 155 N.E.3d 1056, ¶ 56 (8th Dist.) ("An appellate court is not obliged to construct or develop arguments to support an appellant's assignment of error and 'will not "guess at undeveloped claims on appeal."'"), quoting *State v. Piatt*, 2020-Ohio-1177, 153 N.E.3d 573, ¶ 39 (9th Dist.), quoting *McPherson v. Goodyear Tire & Rubber Co.*, 9th Dist. Summit No. 21499, 2003-Ohio-7190, ¶ 31; App.R. 12(A)(2) ("The court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based * * * as required under App.R. 16(A).").

{¶ 43} Even if we were to consider the issue, there is nothing in the record to indicate that the "cold stand" conducted in this case involved "overly suggestive procedures" or otherwise led to an unreliable identification of L.S. The incident occurred in the late afternoon or early evening in an area in which there was plenty of light. J.S. was in close proximity to the perpetrators and had ample opportunity to observe the perpetrators as he was being robbed.

{¶ 44} The cold stand was conducted shortly after the incident. Before the cold stand — and within five minutes after the incident — J.S. had already identified L.S. as one of the perpetrators to his mother. Within minutes after the robbery, J.S. also provided a detailed description of the perpetrators to police, which led police to promptly apprehend L.S. a short distance from the scene of the incident.

{¶ 45} Detective Florentz testified that although J.S. was "shaken up" immediately following the incident, he was able to provide "a lot of details" about the incident and that his version of the events, including his description of the

perpetrators, was consistent throughout the case. There is nothing to indicate that J.S. showed any hesitancy or uncertainty during the cold stand (or at any other time) in identifying L.S. as the male who had pointed a gun at him, threatened to shoot him and took the keys to M.G.'s car from him.

{¶ 47} Further, J.S.'s cold-stand identification of L.S. was not the only evidence linking L.S. to the crime. Aside from his cold-stand identification of L.S., J.S. clearly and unequivocally identified L.S. in court (as well as to his mother prior to the cold stand) as the male who had pointed a gun at him, threatened to shoot him and took the keys to M.G.'s car from him. J.S.'s trial testimony was credible. In addition, L.S. was apprehended with a black mask that matched J.S.'s description of the masks worn by the perpetrators. L.S. has not shown that, even if trial counsel had filed a motion to suppress the cold-stand identification, it would have made a difference in the outcome of the case. Accordingly, we cannot say that L.S. was denied effective assistance of trial counsel based on counsel's failure to file a motion to suppress or to object to evidence of J.S.'s cold-stand identification of L.S.

**CD Containing Video Surveillance Footage**

{¶ 48} With respect to trial counsel's failure to object to the video CD, L.S. argues that the video CD was objectionable because it "was not supported by any testimony of who and how it was created nor what was left out of the video or changed from the different cameras and who owned or produced them" and that, therefore, it was not properly authenticated under Evid.R. 901(A).

{¶ 49} Evid.R. 901(A) addresses the authentication or identification of evidence prior to its admissibility. Evid.R. 901(A) states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." This authentication requirement is "'a low threshold.'" *State v. Rogers*, 8th Dist. Cuyahoga No. 105879, 2018-Ohio-3495, ¶ 15, quoting *State v. Maust*, 8th Dist. Cuyahoga No. 103182, 2016-Ohio-3171, ¶ 24. It "'does not require conclusive proof of authenticity, but only sufficient foundation evidence for the trier of fact to conclude that the evidence is what its proponent claims it to be.'" *Rogers* at ¶ 15, quoting *Maust* at ¶ 24. The proponent of the evidence must demonstrate a "'reasonable likelihood' that the evidence is authentic," which may be supplied by the testimony of a witness with knowledge. *State v. Roseberry*, 197 Ohio App.3d 256, 268, 2011-Ohio-5921, 967 N.E.2d 233, ¶ 65 (8th Dist.), quoting *State v. Bell*, 12th Dist. Clermont No. CA2008-05-044, 2009-Ohio-2335, ¶ 30; *Wright*, 2021-Ohio-2133, at ¶ 77. Evid.R. 901(B) provides examples of several ways that the authentication requirement may be satisfied, including through testimony by a "witness with knowledge" that "a matter is what it is claimed to be." Evid.R. 901(B)(1).

{¶ 50} Photographic evidence, including video evidence, is generally authenticated in one of two ways. *See, e.g., State v. Davis*, 2d Dist. Montgomery No. 28923, 2021-Ohio-1833, ¶ 20; *State v. Rosemond*, 2019-Ohio-5356, 150 N.E.3d 563, ¶ 58 (1st Dist.).

{¶ 51} Under the "pictorial testimony" theory, "'photographic evidence is merely illustrative of a witness' testimony'" and becomes admissible "'when a sponsoring witness can testify that it is a fair and accurate representation of the subject matter, based on the witness' personal observation.'" *Midland Steel Prods. Co. v. U.A.W. Local 486*, 61 Ohio St.3d 121, 129, 573 N.E.2d 98 (1991), quoting *Fisher v. State*, 7 Ark.App. 1, 5-6, 643 S.W.2d 571 (1982); *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 150; *Cleveland v. Alrefaei*, 2020-Ohio-5009, 161 N.E.3d 53, ¶ 28. Under the "silent witness" theory, "'photographic evidence is a "silent witness," which speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring witness.'" *Midland Steel* at 129-130, quoting *Fisher* at 5-6; *Pickens* at ¶ 150; *Alrefaei* at ¶ 28. Under this theory, photographic evidence becomes admissible "upon a sufficient showing of the reliability of the process or system that produced the evidence." *Midland Steel* at 130.

{¶ 52} In this case, Detective Florentz testified that police retrieved surveillance footage after the incident from "multiple cameras at the location," that he had reviewed all of the surveillance footage obtained from that day and that the surveillance footage included on the video CD was "a fair and accurate depiction" of the surveillance footage police had recovered. Detective Florentz further testified that the parking lot depicted in the video footage on the video CD was the parking lot in which the incident had allegedly occurred and he identified L.S. as one of the alleged perpetrators observed in the video footage. J.S. similarly testified that the

alley and parking lot depicted in the video footage were the back alley and parking lot for his apartment complex where the incident occurred. He identified himself in the video footage and also identified L.S. as one of the perpetrators observed in the video footage. He explained, based on his personal knowledge, how the video showed what occurred during the incident, as he had previously testified. During her testimony, M.S. identified her vehicle as the white vehicle depicted in the video footage. The testimony of J.S., Detective Florentz and M.G. was arguably sufficient to authenticate the video CD under Evid.R. 901(A) and (B)(1). Further, there is nothing in the record to suggest that, if trial counsel had promptly raised an objection to the admissibility of the video CD under Evid.R. 901, the state witnesses could not have provided additional testimony laying a more thorough foundation for the admissibility of the video CD, if necessary.

{¶ 53} There is nothing in the record to suggest that the surveillance video footage included on the video CD had been distorted or compromised in any way or that it was otherwise an inaccurate portrayal of the events that occurred. Instead of objecting to the video CD, trial counsel chose to use the video surveillance footage in his cross-examination of witnesses — using it to test the recollections of witnesses, to challenge their credibility and to cast doubt on what they claimed occurred. Under the circumstances here, we cannot say that trial counsel's failure to object to the admissibility of the video CD under Evid.R. 901(A) was not a reasonable, tactical decision.

**{¶ 54}** Further, even if trial counsel was deficient for failing to object to the video CD under Evid.R. 901(A), L.S. has not shown that he was prejudiced as a result, i.e., that there is a reasonable probability that, but for counsel's failure to object to the video CD, the outcome of the case would have been different.

**{¶ 55}** L.S. asserts that, because J.S. testified that "he did not actually see the gun that was tossed and it was held in a grey sweatshirt pocket during the robbery," "[t]he elements of armed robbery could not be proven" if the video CD and J.S.'s testimony regarding what he saw on the surveillance video had been excluded. We disagree.

**{¶ 56}** Although J.S. testified that he did not personally observe the perpetrator in black toss a gun to the perpetrator in grey — i.e., J.S. acknowledged that he only saw perpetrator in black toss a gun to the perpetrator in grey when viewing the surveillance video — he also testified that he personally observed the perpetrator in grey "throw" a gun to L.S. as the males approached him, which L.S. then pointed at him. J.S. testified clearly and unequivocally that L.S. pointed a gun at his stomach, threatening to shoot him if he did not give L.S. the car keys and identify the vehicle to which the keys belonged. J.S. further testified that he complied with L.S.'s demands because he "didn't want to die."

**{¶ 57}** The video CD did corroborate J.S.'s version of events and, based on the record before us, the state presented sufficient evidence to prove all of the elements of each of the offenses at issue, including "the firearm charges," even without the video CD or any witness testimony regarding what could be observed

the video CD. Accordingly, we cannot say that L.S. was denied effective assistance of counsel based on trial counsel's failure to object to the admissibility of the video CD under Evid.R. 901(A).

{¶ 58} L.S.'s second assignment of error is overruled.

{¶ 59} L.S.'s dispositions on Counts 1-5 are vacated, and the matter is remanded to the juvenile court first, to allow the state to elect the allied offense on which it wishes L.S. to be resentenced and second, for resentencing on that count. In addition, we note, sua sponte, that although, at the dispositional hearing, the juvenile court imposed a $100 fine, which it later suspended, on Count 6, in its January 25, 2021 journal entry, it imposed a $400 fine (suspended) on Count 6. Accordingly, this case is also remanded for the juvenile court to issue a nunc pro tunc journal entry correcting this error to reflect the fine imposed at the dispositional hearing.

{¶ 60} Judgment affirmed in part; vacated in part; remanded.

It is ordered that appellant recover from appellee the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

MARY J. BOYLE, A.J., and
EMANUELLA D. GROVES, J., CONCUR